**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JULIANNE LOUIE, Individually and on Behalf of All Others Similarly Situated,<br><br>                  Plaintiff,<br><br>    v.<br><br>CHARMING MEDICAL, LIMITED; KIT WONG; CHING MAN CHEUNG; JOSEPHINE YAN YEUNG; LEUT MING GUNG; SHU TAI VICTOR YU; CATHAY SECURITIES INC.; WWC, P.C.; and COGENCY GLOBAL, INC.,<br><br>                  Defendants. | Civil Action No.<br><br><u>CLASS ACTION</u><br><br><u>DEMAND FOR JURY TRIAL</u> |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Julianne Louie ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Charming Medical, Limited ("Charming" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Charming; and (c) review of other publicly available information concerning Charming.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Charming securities between October 10, 2025, and November 12, 2025, inclusive (the "Class Period"). Plaintiff pursues claims against Charming Medical Ltd., Kit Wong, Ching Man Cheung, Josephine Yan Yeung, Leut Ming Gung, Shu Tai Victor Yu, Cathay Securities Inc., and WWC P.C., and Cogency Global, Inc. (the "Defendants") under the Securities Exchange Act of 1934 (the "Exchange Act").

2. The Company claims to "enhance[] the quality of life from the inside out by integrating Traditional Chinese Medicine (TCM) wellness practices with modern technology." Specifically, by "combining customized TCM-inspired constitution-regulating plans and modern wellness therapies, we provide comprehensive wellness and beauty services and products for women and TCM-inspired therapies tailored for men."

3. The Company was founded in 2016 and is incorporated as an offshore holding company in the British Virgin Islands ("BVI"). Its principal place of business is located at Units

1803-1806, 18/F, Hang Lung Centre, 2-20 Paterson Street, Causeway Bay, Hong Kong, in the People's Republic of China. The Company's stock trades on NASDAQ under the symbol "MCTA."

4. This case arises from the suspension of Charming's stock in November 2025, following a dramatic yet illusory run-up orchestrated by a fraudulent stock promotion scheme. In the weeks leading up to November 12, 2025, Charming's share price surged from the initial public offering price ("IPO") of $4.00 to an all-time high of $29.36 per share, despite no fundamental news from the Company justifying such a spike. Investigations and public reports have revealed that Charming's stock became the subject of an illicit social-media-based promotion scheme that artificially inflated its price. These reports detail how impersonators claiming to be legitimate financial advisors touted Charming in online forums, chat groups, and through social media posts with sensational, but baseless, claims to create a buying frenzy among retail investors.

5. This sharp rise proved short-lived. On November 12, 2025, trading of Charming's stock was halted after the SEC issued an order to do so.[1] In its order, the SEC explicitly cited the fraudulent stock promotion scheme via social media detailed herein as the reason for the halt. Since then, on November 26, 2025, NASDAQ extended the halt indefinitely pending more information from the Company.[2]

6. The structure of Charming's IPO mirrored that of several other recent NASDAQ-listed Chinese companies that were later implicated in pump-and-dump manipulations. These

---

[1]    *In the Matter of Charming Medical Limited*, SEC Release No. 104176, Order of Suspension of Trading (Nov. 11, 2025), https://www.sec.gov/files/litigation/suspensions/2025/34-104176.pdf.

[2]    *Nasdaq Halts Charming Medical Limited*, YAHOO!FINANCE (Nov. 26, 2025), https://finance.yahoo.com/news/nasdaq-halts-charming-medical-limited-120000308.html.

offerings were characterized by unusually low floats (often under 10%), overwhelming insider control via supervoting shares or offshore affiliates, and minimal public disclosures. In each instance, thinly traded shares were aggressively promoted via impersonator-run WhatsApp or WeChat groups and social media "stock tip" campaigns using the stolen identities of U.S. financial advisors. The MCTA IPO shared all of these structural hallmarks, yet the Offering Documents and press statements made no mention of the substantial market-manipulation risk inherent to such architecture.

7.     Charming's stock remains halted because the Company has not provided the information regulators required to lift the suspension. The continued halt underscores that Charming has not dispelled regulators' concerns.

8.     The social-media promoters used stolen identities to push Charming's stock, and the scheme centered on a security that Company insiders controlled. Charming's IPO and its extremely small public float were structured in a way that made the stock easy to manipulate, leaving a cadre of scammers in position to benefit from an artificially inflated price. While Charming's stock was being used as a vehicle for the scammers, the Company issued no warnings or corrective disclosures while false rumors and fabricated "tips" circulated widely. By presenting Charming as a legitimate business while its stock was being artificially inflated, Defendants purposefully enabled the Company to become the vehicle through which the scheme was carried out.

9.     Notably, the gatekeepers who should have prevented this scam, Charming's auditor and IPO underwriter, failed in their duties. Defendant WWC, P.C., the Company's auditor, gave Charming clean audit reports and lent it an air of legitimacy, despite obvious red flags. Similarly, Defendant Cathay Securities, Inc., the IPO underwriter, green-lit Charming's offering and profited

from it.  These Defendants either turned a blind eye to the blatant promotion campaign or were recklessly indifferent to the truth.  By rubber-stamping the IPO and ignoring the stock's extreme, unexplained surge, the underwriter and auditor enabled a scheme that defrauded investors.

10.     Throughout the Class Period, Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about Charming's business, operations, and the true nature of its securities trading activity.  Specifically, Defendants failed to disclose to investors that: (1) Charming was the subject of a fraudulent stock promotion scheme involving social media-based misinformation and impersonated financial professionals; (2) insiders and/or affiliates used offshore or nominee accounts to facilitate the coordinated dumping of shares during a price inflation campaign; (3) Charming's public statements and risk disclosures omitted any mention of the false rumors and artificial trading activity driving the stock price; and (4) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis in fact.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in

substantial part in this Judicial District.  In addition, the Company's agent for service of process and the underwriter Defendant (Cathay Securities Inc.) are located in this District.

14.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

15.    Plaintiff Julianne Louie, as set forth in the accompanying Certification, incorporated by reference herein, purchased Charming securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.    Defendant Charming is a BVI holding company with its principal executive offices located in Hong Kong, China.  The Company's stock trades on NASDAQ under the symbol "MCTA."

17.    Defendant Kit Wong ("Wong") was the Company's Chief Executive Officer ("CEO") at all relevant times.

18.    Defendant Ching Man Cheung ("Cheung") was the Company's Chief Financial Officer ("CFO") at all relevant times.

19.    Defendant Joesphine Yan Yeung ("Yeung") was a Director of the Company at all relevant times.

20.    Defendant Leut Ming Gung ("Gung") was a Director of the Company at all relevant times.

21.     Defendant Shu Tai Victor Yu ("Yu") was a Director of the Company at all relevant times.

22.     Defendant Cathay Securities Inc. ("Cathay") was the Company's underwriter for the October 21, 2025, IPO.

23.     Defendant WWC, P.C. ("WWC") was the Company's auditor at all relevant times.

24.     Defendant Cogency Global, Inc. ("Cogency") was the company's agent at all relevant times.

25.     Defendants Wong, Cheung, Yeung, Gung, and Yu (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors (i.e., the market). The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

26.     Defendant WWC (the "Auditor Defendant") issued clean audit opinions on financial statements incorporated into the October 21, 2025 IPO. Additionally, WWC was Charming's auditor at the time of the IPO and had access to material non-public information during the Class Period. Because of its position, WWC knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being

made were materially false and/or misleading. Furthermore, due to its position, the Auditor Defendant had the ability and opportunity to prevent issuance of the fraudulent SEC filings or cause them to be corrected. Therefore, it is also liable for the false statements pleaded herein.

27.     Defendant Cathay (the "Underwriter Defendant") was the "underwriter" as defined by 15 USC § 80a-2(a)(40) of the Exchange Act for issuance of Charming securities by way of the IPO consisting of the registration statement Charming filed on September 10, 2025 ("Registration Statement") and prospectus supplement filed on October 21, 2025 ("Prospectus") containing the materially false and misleading statements detailed in this Complaint. Due to its position, the Underwriter Defendant had the ability and opportunity to prevent issuance of the fraudulent Registration Statement and Prospectus, and/or cause them to be corrected. Therefore, it is also liable for the false statements pleaded herein.

28.     Defendant Cogency (the "Agent Defendant") was the Company's agent for service of process as required by 17 C.F.R. §249.250 for issuance of Charming securities by way of the IPO consisting of the Registration Statement Charming filed on September 10, 2025, and Prospectus supplement filed on October 21, 2025 containing the materially false and misleading statements detailed in this Complaint. Due to its position, the Agent Defendant had the ability and opportunity to prevent issuance of the fraudulent Registration Statement and Prospectus, and/or cause them to be corrected. Therefore, it is also liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS
### Materially False and Misleading
### Statements Issued During the Class Period

29.     The Class Period begins on October 21, 2025, when the Company filed an IPO prospectus permitting Charming to issue 1,600,000 class A ordinary shares of its common stock

at an initial offering price of $4.00/share for a total capital raise of $6.4M.[3]  Total outstanding shares after the IPO were disclosed to be 14,938,000 Class A and 2,000,000 Class B ordinary shares.  Therefore, the IPO represented just ~9% of total Charming ownership.  In the IPO, to describe its business, the Company stated:

> TCM is a comprehensive medical system that has been practiced in China and other parts of Asia for over two thousand years. It is based on the concept that the human body is a holistic ecosystem, integrating mind, essence, Qi1, body fluids, and blood. The therapeutic mechanism in TCM focuses on maintaining harmony and restoring internal balance within the body. TCM aims to promote disease prevention and enhance overall well-being and the body's ability to self-heal. While it has a long history of empirical practice, there is limited scientific evidence from rigorous, large-scale clinical studies validating its efficacy and safety under the research methodologies commonly used in modern Western medicine. Western medicine primarily relies on randomized controlled trials as the "gold standard" for establishing efficacy, whereas TCM treatments are often individualized and holistic in nature, making them less commonly studied through large-scale RCTs. As a result, the effectiveness of TCM remains a subject of ongoing scientific investigation.
>
> TCM is widely applied in women's health care, particularly in regulating the female menstrual cycle and treating various gynecological issues. Through methods such as herbal therapy, acupuncture, and TCM-based Tuina massage therapy, TCM can improve women's reproductive health and overall constitution. Herbal therapy uses various herbal formulations to restore internal balance and is commonly used to address conditions such as irregular menstruation and dysmenorrhea. Acupuncture regulates the flow of Qi and blood by stimulating specific acupoints, which can relieve pain and balance the endocrine system. TCM-based Tuina massage therapy promotes blood circulation, relaxes muscles, and supports postpartum recovery.
>
> We are a Hong Kong-based provider of comprehensive TCM-inspired wellness and beauty care services and products that are rooted and influenced by the principles and practices of TCM, such as the use of herbal ingredients, acupuncture techniques, Tuina massage, and dietary guidance. Our services are designed to address a wide range of health improvement needs health improvement needs, such as alleviating premenstrual syndrome, menstrual irregularities, dysmenorrhea, leukorrhea, pelvic inflammatory disease, menopausal care, breast health, and other common women's health conditions. We believe that our TCM-inspired therapies can help balance the female endocrine system and improve women's constitution and overall health. Additionally, the Operating Subsidiaries offer TCM-inspired therapies tailored to men.

---

[3]    Charming Medical Limited Prospectus, filed October 20, 2025, https://www.sec.gov/Archives/edgar/data/2035992/000121390025100671/ea0213012-11.htm#T10.

Through our four wellness centers in Hong Kong, we offer a wide range of beauty, wellness, and postpartum services and products for women that are rooted and influenced by the principles and practices of TCM with a focus on utilizing TCM approaches in addressing women's health issues. Our beauty, wellness, and postpartum services include but are not limited to womb-warming therapy, BTS (Beauty, Tailor-made, Slim) pelvic detox therapy, agarwood moxibustion therapy, TCM-inspired prenatal massage therapy, and Indonesian traditional abdominal binding therapy. In addition, under the "Beauty Lab" brand, we also offer products, including (i) TCM-inspired supplements products, such as Beauty Lab home herbal uterine care patch, probiotic intimate wash, and Yin nourishing pill sets, designed to support uterine health, improve physical weakness, and balance endocrine functions for female customers; and (ii) beauty products, such as ginseng soothing anti-allergy moisturizing wash, which provide comprehensive care for skin issues and scalp health. Moreover, we also offer consultancy services to provide TCM-inspired therapy technical training and dietary therapy training to other well-established and reputable beauty salons, massage centers, and similar institutions. In March 2025, we launched a franchise model for our Beauty Lab brand, granting exclusive rights to the Franchisees to operate branded beauty and wellness outlets. Franchisees are authorized to offer services such as scalp and haircare and women's wellness services under the Beauty Lab brand. We derive franchise-related revenue mainly from initial franchise fees, royalty and promotional fees, brand management fees, training and administration fees. As of March 31, 2025 and as of the date of this prospectus, we had 1 and 3 franchisees, respectively.

30.     The IPO also contained the following 2024, and 2025 financial results:

We generated revenue of $6,221,751 and $6,015,375, respectively, and achieved a net income of $1,199,085 and $821,743, respectively, for the years ended March 31, 2025 and 2024. We generated revenue primarily through the following: (i) beauty, wellness, and postpartum services; (ii) sales of products; (iii) consultancy services; and (iv) franchise activities. For the fiscal years ended March 31, 2025, and 2024, the revenue from beauty, wellness, and postpartum services amounted to $5,967,277 and $5,813,814, representing 96.0% and 96.6% of total revenue, respectively. The revenue from sales of products was $207,766 and $88,992 for the fiscal years ended March 31, 2025, and 2024, representing 3.2% and 1.5% of total revenue, respectively. The revenue from consultancy services was nil and $112,569 for the fiscal years ended March 31, 2025, and 2024, representing 0% and 1.9% of total revenue, respectively. The revenue generated from the provision of franchise activities amounted to $46,708 and nil for the fiscal years ended March 31, 2025 and 2024, representing 0.8% and 0% of total revenues, respectively.

31.     Lastly, the IPO details the Company's strengths and strategies that will support the

future growth of Charming:

**Our Competitive Strength**

We believe we have the following competitive strengths:

Professional Team and Certified Services

Our Operating Subsidiaries boast a team of professional TCM practitioners experienced in women's health and skilled technicians, offering comprehensive care and therapies tailored to women. Our TCM practitioners provide consultation services, ensuring customers receive personalized health guidance and care, with each holding a Registered Chinese Medicine Practitioner Certificate issued by the Hong Kong Chinese Medicine Council. As advised by FCLK, our Hong Kong counsel, the statutory professional qualifications required for TCM practitioners to practice TCM under the laws of Hong Kong fall under the Chinese Medicine Ordinance (Chapter 549 of the Laws of Hong Kong) ("CMO"). The CMO provides for the regulation of activities or matters relating to Chinese medicine, including, among other matters, the licensing requirements for Chinese medicine practitioners, and the practice, use, manufacture, possession and trading of Chinese medicine in Hong Kong. According to the CMO, a Chinese medicine practitioner must be listed or registered under the Chinese Medicine Ordinance and hold a Registered Chinese Medicine Practitioner Certificate issued by the Hong Kong Chinese Medicine Council before being permitted to practice Chinese medicine in Hong Kong. Moreover, under section 108(2) of the CMO, any person who is not a registered Chinese medicine practitioner or listed Chinese medicine practitioner practices Chinese medicine commits an offence and is liable to a fine of HK$100,000 and imprisonment for three years, or on conviction upon indictment to imprisonment for five years. Section 158 of the CMO exempts registered Chinese medicine practitioners from obtaining licenses for possessing and dispensing Chinese herbal medicines listed in Schedule 1 to the CMO to persons on prescription. To ensure high-quality services, our Indonesian traditional abdominal binding therapy is performed by technicians who have completed training in Indonesian abdominal binding. Additionally, our Japanese facial bone adjustment services are performed by our TCM practitioners, who hold memberships with the Hong Kong Chinese Orthopedics Society, and our massage services are delivered by our TCM practitioners. We believe these professional qualifications held by our TCM practitioners and technicians as well as the additional training and professional memberships they hold contribute to the overall quality of our services.

Comprehensive One-Stop Health and Wellness Services

Our Operating Subsidiaries offer a wide range of services, including feminine care, prenatal and postpartum therapies, and women's health products, providing comprehensive solutions to meet the diverse needs of female customers. We also launched home services during the COVID-19 pandemic, to enable our customers to enjoy professional care in the comfort of their homes. Our approach is to serve women across various life stages, and continuously track and adjust our services to meet their evolving health needs. Furthermore, we offer TCM-inspired hair care therapies to male customers.

<u>High-quality Assurance for Products and Services</u>

Our Operating Subsidiaries are committed to delivering quality products and services while maintaining a satisfactory customer experience. We implement quality control measures, including training service providers and selecting third-party product suppliers, to ensure compliance with safety and efficacy standards. Our Indonesian traditional abdominal binding therapy is performed by technicians who have completed training in Indonesian abdominal binding.
The suppliers we currently contract with all hold a Good Manufacturing Practice (GMP) certificate and comply with the globally recognized quality management standard ISO 9001. We believe adherence to these quality control measures contributes to customer trust and brand reputation.

<u>Integration of TCM Principles and Modern Technology</u>

The Operating Subsidiaries are dedicated to integrating TCM principles with modern technology to offer comprehensive wellness and beauty solutions. Our needle-free thread embedding therapy leverages advanced noninvasive cosmetic technology to deliver substantial aesthetic results without the need for surgery, enhancing both skin quality and facial contours. We have also developed the TCM E-plus eye care therapy, which improves eye blood circulation, relieves eye fatigue, and enhances visual health through targeted acupoint massage.

<u>Experienced Management Team with Substantial Industry Experience</u>

The management team brings extensive experience and deep expertise in the TCM-inspired wellness and beauty industry. Our team members include seasoned TCM practitioners and beauty experts, all dedicated to enhancing service quality and customer satisfaction.

<u>Customer-Centric Approach with Customized Services</u>

Our Operating Subsidiaries uphold a customer-centric philosophy and are committed to providing personalized services and solutions tailored to customers' needs. Through continuous communication with customers, we optimize and improve our service offerings. We aim to create a caring and professional environment where every customer feels valued and respected, fostering long-term relationships and customer loyalty.

**Our Growth Strategies**

<u>Expanding Our Presence in International Markets</u>

We plan to increase our international market share by entering new geographic regions or countries. This will involve conducting thorough market research to

understand different countries' cultural nuances, consumer habits, and regulatory requirements and adjust our marketing strategies and product positioning accordingly. We will prioritize regions with significant market potential and rapid economic growth, such as Southeast Asia. In addition to leveraging e-commerce platforms to expand global sales channels and enhance brand recognition, we intend to evaluate potential franchise opportunities in select international markets as part of our broader growth strategy. These opportunities will be assessed based on local market demand, operational feasibility, and alignment with our brand and service standards.

Building Strategic Partnerships

We will evaluate and selectively seek strategic partnerships with other companies to collaborate on market promotion, product development, or sales activities. We believe such partnerships can foster resource sharing, reduce costs, and expand market influence. For example, we may collaborate with some well-known cosmetic brands, health institutions, or retailers to launch co-branded products or joint promotional campaigns. Additionally, we plan to establish partnerships with research institutions or universities in Hong Kong to drive technological research and innovation, and we expect such partnerships will enhance product competitiveness and market appeal in the future.

Investing in Technological Innovation and Improving R&D Capability

We plan to invest in technological innovation and improve our research and development ("R&D") capability to develop new beauty products and services. Our approaches include investing in ingredient research, and adopting advanced technologies and equipment to improve the efficacy of our products and ensure they can align with the constantly changing beauty standards. For example, we may invest in conducting continuous research on exploring new uses of common medicinal herbs to develop skincare products. Furthermore, we plan to adopt advanced beauty instruments, such as laser devices and micro-needling instruments to provide more professional and diverse services, and we expect the adoption of such advanced devices and instruments to improve our service and product offerings.

Establishing a Strong Brand Image through Differentiation

We will focus on building a strong brand image of the "Beauty Lab" brand through differentiation to attract potential customers. We plan to do so through marketing campaigns, quality assurance, and enhanced customer experience. For instance, brand promotion and engagement will be carried out via social media and online platforms to increase consumer awareness and trust in the "Beauty Lab" brand. We are confident that we can improve customer satisfaction and loyalty by providing high-quality customer service and personalized experiences. Additionally, we believe that hosting beauty seminars, workshops, and other events will strengthen

interaction and connection with customers, thereby establishing a positive brand reputation.

<u>Diversifying Product and Service Offerings</u>

Currently, we offer TCM-inspired hair care therapies to male customers. As part of our growth strategy, we plan to expand our service and product offerings tailored to male consumers by developing and introducing additional TCM-inspired wellness solutions. These may include herbal-based wellness products designed to address common health concerns among men, such as insomnia, chronic fatigue, acne & oily skin, and male pattern baldness. By broadening our range of services, we aim to enhance customer engagement, increase brand loyalty, and capture a larger share of the male wellness market. We believe that diversifying our TCM-based offerings for male consumers will strengthen our competitive position and support our long-term revenue growth.

32.    The structure of Charming's IPO was intentionally designed to facilitate an eventual pump-and-dump scheme.  Charming conducted a low-float IPO, offering just 1,600,000 shares to the public, merely 9% of total outstanding equity, while maintaining overwhelming insider control through Class B supervoting shares and offshore holding entities.

33.    The thin public float also made Charming's stock uniquely susceptible to price manipulation, as even modest buying pressure could create explosive price moves.

34.    The structure of Charming's IPO mirrored that of several other recent NASDAQ-listed Chinese companies that later faced manipulation concerns, including China Liberal Education Holdings and Ostin Technology.  These offerings were characterized by unusually low floats (often under 10%), overwhelming insider control via supervoting shares or offshore affiliates, and minimal public disclosures.  In each instance, thinly traded shares were aggressively promoted via impersonator-run WhatsApp or WeChat groups and social media "stock tip" campaigns using the stolen identities of U.S. financial advisors.  The MCTA IPO shared all of these structural hallmarks, yet the offering documents and press statements made no mention of the substantial market manipulation risk inherent to such architecture.

35.     Despite representing that Charming's management was "experienced" and had "extensive knowledge" of wellness operations, the offering documents and related statements omitted any cautionary disclosure about the Company's stock being unusually susceptible to speculative volatility due to the low public float and tight insider control.  Given the surge of overseas pump-and-dump operations targeting Chinese-linked IPOs in 2025, the failure to even reference this risk in the Prospectus is materially misleading, particularly given the contemporaneous halts of peer Chinese companies (e.g., Ostin Technology) just months earlier.

36.     On November 13, 2025, the Company issued the following statement in response to the SEC order halting trades of Charming shares:

**Temporary Suspension of Trading**

On November 11, 2025, Charming Medical Limited (the "Company") received from the U.S. Securities and Exchange Commission (the "SEC") an order (the "Order") suspending trading in the Company's securities for the period from 4:00 AM ET on November 12, 2025, through 11:59 PM ET on November 25, 2025. The Order is available at https://www.sec.gov/files/litigation/suspensions/2025/34-104176-ts.pdf. According to the Order, the suspension was imposed due to potential manipulation in the trading of the Company's securities that may have been effectuated through recommendations made to investors by unknown persons via social media to purchase, hold, and/or sell the Company's securities and to post screenshots of their transactions. The SEC stated that such activities appeared to be designed to artificially influence the market price and trading volume of the Company's securities. On November 12, 2025, the Company received an information request from The Nasdaq Stock Market LLC ("Nasdaq") for certain information and documents.

The Company has not authorized, participated in, or been involved with any promotion or recommendation of its securities via social media or otherwise. It is fully committed to cooperating fully with the SEC, Nasdaq, and other regulatory authorities as necessary. The Company's ongoing business operations remain normal, and there has been no material change to the Company's business operations or financial position as of the date of this report.

The November 13th press release was signed by Defendant Wong, as the contact for the Company.

**Auditor Defendant Allegations**

37.    The unqualified audit opinion of WWC covering the two-year period ended March 31, 2025, was incorporated into the IPO, registration statements, prospectuses and other "offerings" of securities the Company filed during the Class Period.  In its opinion, WWC certified that, "[i]n our opinion, the financial statements present fairly, in all material respects, the financial position of the Company" and that the audits were conducted "in conformity with accounting principles generally accepted in the United States of America ('GAAP')" and "in accordance with the standards of the [Public Company Accounting Oversight Board] PCAOB" which "require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud."  They go on to affirm the procedures they performed stating:

> Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

38.    This unqualified audit report incorporated into the IPO and other SEC filings was false and misleading because Charming's consolidated financial statements were not prepared in accordance with GAAP or PCAOB requirements.

39.    In issuing unqualified audit opinions on Charming's financial statements—despite these GAAP and PCAOB violations—WWC failed to comply with the professional standards dictated by the PCAOB.  These standards required WWC to exercise due professional care in the performance of the audit and to obtain competent, sufficient evidentiary matter to form a basis for

its opinion, and to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud.[4]

40.     In conducting its audits, WWC had access to the files and key employees of the Company at all relevant times.  As Charming's auditor, WWC had continuous access to and knowledge of the Company's confidential internal, corporate, financial, operating, and business information, and had the opportunity to observe and review Charming's business and accounting practices, and to test the Company's internal accounting information and publicly reported financial statements as well as Charming's internal controls and structures.  Accordingly, WWC was aware of significant deficiencies and material weaknesses at the Company.  Thus, had WWC complied with PCAOB standards, it would have determined that there was no reasonable basis for its unqualified audit report because, among other things, WWC was aware of undisclosed facts tending to seriously undermine the accuracy of its audit reports, its conformity with GAAP, and the Company's reported financial metrics.

### The Truth Begins to Emerge

41.     On November 11, 2025, Charming's stock reached a closing price of $29.36, with an intraday high of $31.70.  At that time, the Company had approximately 17.18M shares outstanding, giving it a market capitalization of around $504 million.

42.     During aftermarket trading hours, on November 11, 2025, the SEC issued an order halting trading of Charming securities from November 12th through 25th, 2025.[5]  Its order detailed how social media was being used to artificially inflate the price of Charming stock where scammers

---

[4]      PCAOB, *AS 1000: General Responsibilities of the Auditor in Conducting an Audit*, https://pcaobus.org/oversight/standards/auditing-standards/details/as-1000--general-responsibilities-of-the-auditor-in-conducting-an-audit [https://perma.cc/S4PV-DDED].

[5]      Order of Suspension, *supra* n.1.

influenced victims to buy and hold Charming shares for no legitimate reason. Therefore, to protect the public and interest of investors, trading of the Company's stock was to be suspended.

43.    Public reports have also revealed that Charming's stock was used as a primary vehicle for an illicit "pump-and-dump" promotion scheme. Impersonators, using stolen identities of legitimate financial advisors, touted Charming in online forums, chat groups, and through social media posts with sensational, but baseless, claims to create a buying frenzy among retail investors. The structure of Charming's public listing and low float made the scam possible.

44.    Charming itself admits to engaging in social media marketing campaigns for the facially innocent purposes of "enhance[ing] customer experiences" and "increase[ing] awareness and loyalty."[6] However, after an exhaustive search, Charming does not appear to have any legitimate social media presence. Instead, the Charming IPO took place in the midst of a Chinese stock scam epidemic where countless thinly floated, offshore Chinese companies like Charming were being used as vehicles to defraud NASDAQ investors.[7] Therefore, at a minimum, by conveying to investors that

---

[6]    *Issuer Free Writing Prospectus*, Beauty Lab Group (Aug. 2025), https://d2ghdaxqb194v2.cloudfront.net/3044/198212.pdf.

[7]    Jeff Horwitz and Engen Tham, *Meta tolerates rampant ad fraud from China to safeguard billions in revenue*, REUTERS (Dec. 15, 2025), https://www.reuters.com/investigations/meta-tolerates-rampant-ad-fraud-china-safeguard-billions-revenue-2025-12-15/; Dave Michaels, *Obscure Chinese Stock Scams Dupe American Investors by the Thousands*, WSJ (June 16, 2025), https://www.wsj.com/finance/regulation/obscure-chinese-stock-scams-dupe-american-investors-by-the-thousands-8416f795?gaa_at=eafs&gaa_n=AWEtsqfQi1wq_y7YoeyV7LSlctZWbtAyWL-Vl2urQ6o_NL2CSM308n4nruZvzbqMZDU%3D&gaa_ts=6942fc09&gaa_sig=nrVqDB8flHKSlCtwh7yR6ayFOMLYl2Ax1XYeUJiLo_jO-J9sgqJP0aDwIF8UvoccMGDrSMHZ2Yg8zG4oXSLNlg%3D%3D; Dara-Absa Ita, *Billions Lost by Investors as Meme Stock Scams Surge: 'Pump and Dump' Schemes on the Rise*, INVESTOPEDIA (Sept. 24, 2025), https://www.investopedia.com/meme-stock-scams-surge-11812439; see also Joel M. Cohen, *et al.*, *SEC targeting cross-border fraud, with a focus on Chinese companies & gatekeepers,* WHITE & CASE (Sept. 16, 2025), https://www.whitecase.com/insight-alert/sec-targeting-cross-border-fraud-focus-chinese-companies-gatekeepers.

legitimate information about the Company could be found on social media despite the obvious risks, the Company, Individual Defendants, the underwriter, agent, and auditor recklessly disregarded a substantial risk that Charming would be used to orchestrate a pump-and-dump scheme, if not being knowing participants in the fraud themselves.

45.     Here, Plaintiff was a victim of one such impersonator.  After clicking on a Facebook ad promoting stock advice, Plaintiff was funneled into a WhatsApp Group claiming to be the firm the advertised financial advisor worked for.  Below is an example of one such funneling advertisement for MCTA on X posted during the Class Period:[8]



After clicking on the above link users are funneled to Telegram where they are invited to join the investment group below:[9]

---

[8]     Aultz Hassan, $MCTA $IRS, X (Nov. 4, 2025 12:36 pm), https://x.com/aultz11255/status/1985793170635194571.

[9]     *Stock Market Profit Guide*, TELEGRAM, https://t.me/+_jrpFlKm0Aw3ZWU0.



46.    Plaintiff joined one such group on WhatsApp and was instructed to buy and hold large quantities of MCTA stock during the Class Period.  The level of buying MCTA was in such great quantities it triggered safeguards at Plaintiff's broker which she was encouraged to circumvent in order to maximize guaranteed returns.   Below are a series of WhatsApp chats evidencing the scheme:[10]



---

[10]    Edwin Dorsey, StopNasdaqChinaFraud.com, https://www.stopnasdaqchinafraud.com/.

47.     On November 13, 2025, Capybara Research, a leading forensic financial research authority, published the following message on its X account calling out the Charming IPO and subsequent pump and dump as a fraud:[11]



48.     Together, the facts alleged by Plaintiff and other Class members, along with news releases like those of Capybara Research prove that throughout the Class Period, Charming's stock price was artificially inflated through coordinated social media campaigns which disseminated materially false and misleading information about the Company.  Through these campaigns, impersonators using stolen identities of legitimate financial advisors lured victims through Facebook/Instagram ads into private investor chat groups on platforms like WhatsApp/Messenger/Threads to circulate unfounded news and generate excitement and raise buying pressure of Charming stock.

---

[11]     Capybara Research, X (Nov. 13, 2025), https://x.com/CapybaraShort/status/1988974028565147863.

49.     The statements made by impersonators had no legitimate basis in the Company's actual operations or financial condition, yet they were presented as authoritative tips to lure retail investors into purchasing Charming shares at inflated prices.  By peddling fabricated prospects of imminent corporate success, the scheme misled investors about Charming's value and created artificial demand for the stock.  Charming's IPO and low float were purposefully designed by Defendants to enable this fraudulent scheme to be effectuated.

## CLASS ACTION ALLEGATIONS

50.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Charming securities between October 21, 2025, and November 12, 2025, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

51.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Charming's shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Charming shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Charming or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

52.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

53.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

54.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Charming; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

55.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

56. The market for Charming's securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Charming's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Charming's securities relying upon the integrity of the market price of the Company's securities and market information relating to Charming and have been damaged thereby.

57. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Charming's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Charming's business, operations, and prospects as alleged herein.

58. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Charming's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other

members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

59.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

60.    During the Class Period, Plaintiff and the Class purchased Charming's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

61.    As alleged herein, Defendants acted with scienter since Defendants: (1) knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; (2) knew that such statements or documents would be issued or disseminated to the investing public; and (3) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Charming, their control over, and/or receipt and/or modification of Charming's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Charming, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

62.     The market for Charming's securities was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Charming's securities traded at artificially inflated prices during the Class Period.  On November 11, 2025, the Company's share price reached a Class Period high of $31.70 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Charming's securities and market information relating to the Company and have been damaged thereby.

63.     During the Class Period, the artificial inflation of Charming's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Charming's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Charming and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and, when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, and each of them has been damaged as a result.

64.     At all relevant times, the market for Charming's securities was an efficient market for the following reasons, among others:

(a)     Charming shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)      as a regulated issuer, Charming filed periodic public reports with the SEC and/or the NASDAQ;

(c)      Charming regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)      Charming was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

65.      As a result of the foregoing, the market for Charming's securities promptly digested current information regarding Charming from all publicly available sources and reflected such information in Charming's share price.  Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of Charming's securities at artificially inflated prices and a presumption of reliance applies.

66.      A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have

considered them important in making investment decisions.  Given the importance of the Class

Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

67.    The statutory safe harbor provided for forward-looking statements under

certain circumstances does not apply to any of the allegedly false statements pleaded in this

Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts

and conditions.  In addition, to the extent certain of the statements alleged to be false may be

characterized as forward looking, they were not identified as "forward-looking statements" when

made and there were no meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the purportedly forward-looking statements.  In

the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-

looking statements pleaded herein, Defendants are liable for those false forward-looking statements

because at the time each of those forward-looking statements was made, the speaker had actual

knowledge that the forward-looking statement was materially false or misleading, and/or the forward-

looking statement was authorized or approved by an executive officer of Charming who knew that

the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

68.    Plaintiff repeats and re-alleges each and every allegation contained above as

if fully set forth herein.

69.    During the Class Period, Defendants carried out a plan, scheme, and course

of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and

other members of the Class to purchase Charming's securities at artificially inflated prices. In furtherance of this unlawful plan, scheme, and course of conduct, Defendants, and each defendant, took the actions set forth herein.

70.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Charming's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

71.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Charming's financial well-being and prospects, as specified herein.

72.    Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Charming's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Charming and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

73.     Each of the Individual Defendant's primary liability and controlling-person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

74.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Charming's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

75.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Charming's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Charming's securities during the Class Period at artificially high prices and were damaged thereby.

76.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Charming was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Charming securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

77.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

78.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

79.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

80.     Individual Defendants acted as controlling persons of Charming within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

81.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

82.     As set forth above, Charming and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and

other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: December 19, 2025                **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

_/s/_ Jeffrey P. Jacobson
Jeffrey P. Jacobson
Sean Masson
The Helmsley Building
230 Park Ave, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
jjacobson@scott-scott.com
smasson@scott-scott.com

John T. Jasnoch (_pro hac vice_ forthcoming)
Mollie Chadwick (_pro hac vice_ forthcoming)
600 W. Broadway, Suite 3300
San Diego, CA 92101

Telephone: (619) 233-4565
Facsimile: (619) 233-0508
jjasnoch@scott-scott.com
mchadwick@scott-scott.com

Tom Grady (*pro hac vice* forthcoming)
**GRADYLAW**
720 Fifth Avenue South, Suite 200
Naples, Florida 34102
tgrady@gradylaw.com

*Counsel for Plaintiff and the Proposed Class*

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

I, Julianne Louie, hereby certify that the following is true and correct to the best of my knowledge information and belief:

1.      I have reviewed the complaint in this action and authorized Scott+Scott Attorneys at Law to file a lead plaintiff motion on my behalf.

2.      I am willing to serve as a representative party on behalf of all persons and entities that purchased, or otherwise acquired, shares of Charming Medical Limited ("MCTA").

3.      During the relevant period, I purchased and/or sold the security that is the subject of the complaint, as set forth in the attached **Schedule A.**

4.      I did not engage in the foregoing transactions at the direction of counsel nor in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

5.      During the three-year period preceding the date of my signing this Certification, I have not sought to serve, or served, as a representative party or lead plaintiff on behalf of a class in any private action arising under the Securities Act or the Exchange Act.

6.      I will not accept any payment for serving as a representative party on behalf of the Class beyond the *pro rata* share of any recovery, expert for such reasonable costs and expenses (including lost wages) directly related to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___12/15_____ 2025 at ___San francisco, ca_____ (city, state).


_____

Julianne Louie

**SCHEDULE A**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| BUY | 11/11/25 | 257 | $27.20 |
| BUY | 11/11/25 | 1838 | $27.20 |
| BUY | 11/11/25 | 3676 | $27.20 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Dropbox** Sign

Audit trail

| | |
|---|---|
| **Title** | MCTA PSLRA certification with schedule a_ |
| **File name** | MCTA PSLRA certif...h schedule a_.pdf |
| **Document ID** | cabe609a0b87b732a40dad22e2bfac8e39c4ea09 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

| | | |
|---|---|---|
| SENT | **12 / 15 / 2025**<br>16:16:46 UTC-8 | Sent for signature to Julianne Louie (juli@juliannelouie.com) from mchadwick@scott-scott.com<br>IP: 68.72.99.148 |
| VIEWED | **12 / 15 / 2025**<br>16:23:57 UTC-8 | Viewed by Julianne Louie (juli@juliannelouie.com)<br>IP: 148.64.101.210 |
| SIGNED | **12 / 15 / 2025**<br>16:24:59 UTC-8 | Signed by Julianne Louie (juli@juliannelouie.com)<br>IP: 148.64.101.210 |
| COMPLETED | **12 / 15 / 2025**<br>16:24:59 UTC-8 | The document has been completed. |