**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CHARMING MEDICAL LIMITED SECURITIES LITIGATION | Case No. 1:25-cv-10535-JPO<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

# AMENDED CLASS ACTION COMPLAINT

Lead Plaintiffs Grant Albert, James McKnight, and Bernard Whelan ("Lead Plaintiffs" or "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Amended Class Action Complaint (hereinafter the "Complaint" or the "Amended Complaint") against Defendants Charming Medical Limited ("Charming Medical" or the "Company"), Kit Wong ("Wong"), Ching Man Cheung ("Cheung"), Josephine Yan Yeung ("Yeung"), Leut Ming Gung ("Gung"), Shu Tai Victor Yu ("Yu"), Cathay Securities Inc. ("Cathay Securities"), WWC, P.C. ("WWC"), and Cogency Global, Inc. ("Cogency Global") (collectively the "Defendants"), allege the following based upon personal knowledge as to Plaintiffs and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company, and other information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of all persons or entities, other than Defendants, who: (1) purchased or otherwise acquired Charming Medical's common stock pursuant and/or traceable to the Registration Statement filed in connection with the Company's October 21, 2025 Initial Public Offering ("IPO"), seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"); and/or (2) purchased or otherwise acquired Charming Medical's common stock between October 21, 2025 and November 11, 2025, both dates inclusive ("Class Period"), on the NASDAQ or another U.S. trading venue, seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. Since at least early 2024, a wave of pump-and-dump fraud targeting microcap Chinese companies that are newly listed in the United States emerged. It then rapidly escalated, and in 2025 alone, the FBI reported a 300% increase in complaints about pump-and-dump schemes orchestrated on messaging applications or via social media that involved Chinese microcap companies. The scheme was invariably the same: stock manipulators, often impersonating others, circulated false promotional materials in WhatsApp chatrooms, WeChat groups, and on platforms like Twitter (X), pressuring investors to buy shares. The targeted companies fit a specific profile. Almost all sought to raise less than $15 million in the United States, had a low public float, dominant insider control, obscure businesses with little to no revenues, significant losses, and no meaningful analyst coverage.

3. Because of the low public float, in particular, manipulators can easily use online promotions to drive up prices to spectacular heights before dumping their shares on unsuspecting investors at peak prices. Before Charming Medical went public, the Department of Justice seized

assets and indicted insiders tied to at least one such scheme, the stock prices of five (5) NASDAQ-listed microcap companies of Chinese origin had collapsed by between 84% and 93% in a single month, and both Congress and the SEC had greatly increased their scrutiny of these frauds. In the months before the Company went public, the SEC had already suspended trading in at least eight (8) microcap Chinese/Asian companies because their stocks were manipulated in similar pump-and-dump schemes.

4. Because of the growing epidemic of manipulation in low float China-based (including Hong Kong-based) microcap IPOs, NASDAQ proposed a rule on September 4, 2025 (just before Charming Medical's IPO) that would require Chinese microcap IPOs to raise at least $25 million from public investors to list on that exchange. That proposed rule, designed to root out low-float manipulation from bad actors, would have barred Charming Medical's IPO outright had it been in effect at the time of the IPO. But Charming Medical rushed its IPO to beat the consequences of the rule, asking the SEC on September 29, 2025 to "accelerate the effectiveness" of its defective Registration Statement. Cathay Securities also requested that the SEC accelerate the effectiveness of the offering, helping ensure that the offering was listed before the new requirement kicked in.

5. Charming Medical shared the same characteristics as other Chinese microcap IPO pump-and-dumps. The Company is a holding entity incorporated in the British Virgin Islands ("BVI") with no material operations of its own, and the operating subsidiary had an obscure and small business, running four storefront beauty clinics in Hong Kong, China that offer traditional Chinese medicine ("TCM") therapies. The Company had small revenues and minimal profits. A single insider dominated voting control over Charming Medical—Chief Executive Officer ("CEO") Wong, controlled over 91% of aggregate voting power after the IPO through a dual-class

share structure, leaving public investors with no meaningful say over the Company's affairs. Most importantly, the Company's post-IPO public float was less than 12.12% of total shares outstanding, making the stock extraordinarily easy to squeeze during the Class Period. In every material respect — obscure business practices, minimal revenue, going concern doubt, dominant insider control, and a negligible float — Charming Medical was a textbook candidate for the social media-driven pump-and-dump schemes that had plagued the U.S. markets for years before its IPO.

6. Even worse, the three gatekeepers Charming Medical chose for the IPO had already been part of many similar pump-and-dump IPOs. In the United States, issuers seeking to go public must contract with one or more underwriters, an auditor authorized to practice before the SEC, and for foreign companies, a U.S. representative agent. For each, Charming Medical selected entities linked to a sordid history of pump-and-dump fraud. Underwriter Cathay Securities, auditor WWC, and U.S. representative Cogency Global (hereinafter the "Gatekeeper Defendants") all repeatedly facilitated microcap pump-and-dump frauds before Charming Medical's IPO. A Bloomberg investigation identified that approximately 50% of the IPOs Cathay Securities underwrote were linked to pump-and-dump schemes related to microcap companies. Of the eighteen (18) IPOs Cathay Securities underwrote between August 2024 and October 2025, ten (10) were subsequently implicated in pump-and-dump manipulations. Seven (7) of those frauds had already been revealed before Charming Medical went public, and at least two (2) companies implicated had already been suspended from trading by the SEC. Cogency Global served as the U.S. agent for at least ten (10) other companies that were part of fraudulent pump-and-dump schemes, and WWC was the auditor for at least four (4) companies involved in similar frauds before Charming Medical went public.

7. Cathay Securities had actual knowledge that companies it underwrote were being manipulated. Cathay Securities itself posted a notice on its website on October 10, 2025 — 11

days before Charming Medical's IPO — acknowledging that fraudsters were impersonating it on WhatsApp, WeChat, Telegram, and Discord to promote microcap stocks. Yet, it went ahead and underwrote Charming Medical's IPO 11 days later, alongside WWC and Cogency Global, who had also repeatedly assisted similar frauds.

8. None of these known risks were accurately disclosed in the defective Registration Statement used to sell Charming Medical Class A ordinary shares to U.S. investors. Instead, the defective Registration Statement merely provided boilerplate disclosures concerning hypothetical risks that would apply to any new company: generic warnings that the stock price might be volatile and investors may suffer losses, that a liquid market might not develop, that the Company might be delisted from NASDAQ, and that NASDAQ might apply more stringent listing criteria because of the Company's small offering size and high insider ownership.

9. Tellingly, the Registration Statement acknowledged future proposed heightened listing requirements for companies like Charming Medical yet framed them as a hypothetical future risk. It did not acknowledge that NASDAQ had filed with the SEC a proposed rule requiring companies of Chinese origin to raise at least $25 million in an effort to prevent the very type of fraud at issue here, that Charming Medical and Cathay Securities had asked the SEC to accelerate the effectiveness of the Registration Statement, so that Charming Medical could list before the rule took effect, or that the rule (if then in effect) would have blocked the NASDAQ listing of Charming Medical's IPO.

10. Despite all of this, the defective Registration Statement failed to disclose the specific and concrete risks that Charming Medical's stock would be manipulated by the same social media-driven pump-and-dump schemes that had already devastated seven (7) other Cathay

Securities-underwritten IPOs, or that such a scheme, once triggered, would almost certainly and permanently destroy share value.

11. And that is precisely what happened. Within 10 days of the IPO, Charming Medical's stock was aggressively promoted through false and misleading posts on Twitter (X) and WeChat and WhatsApp chatrooms, driving the price up from $4 per share to nearly $20 per share. The manipulation peaked on November 11, 2025, when 4.2 million shares — more than 2.2 times the Company's entire public float — traded at prices between $25.90 and $31.70 per share. On the evening of November 11, 2025, the SEC suspended trading in Charming Medical stock.

12. Trading has never resumed. NASDAQ extended the suspension indefinitely, conditioning resumption on the Company's provision of additional information. Despite claims of "cooperation," as of the date of this Amended Complaint — more than six (6) months later — Charming Medical and the Individual Defendants have still not provided sufficient information to lift the NASDAQ halt. The Company's common stock has not since traded on any exchange or alternative venue. Most of its directors have resigned and abandoned the Company since its suspension. The Company has taken no steps to restore liquidity to American investors, such as by listing on the OTC or Pink Sheets. That the Company has done so little to facilitate liquidity for the American investors it devastated confirms that the purpose all along was to grab cash from U.S. investors in a manipulative IPO.

13. Defendants' decision to omit the serious risks of manipulation in the defective Registration Statement is sufficient to plead strict liability claims under the Securities Act pursuant to Rule 8 of the Federal Rules of Civil Procedure. The Company's profile and structure, combined with its decision to hire seasoned facilitators of fraud as gatekeepers and the fallout from the highly

unusual trading halt are all factors that solidify an inference of fraud for Plaintiffs' Exchange Act claims.

14. As a result of Defendants' wrongful acts and omissions, Plaintiffs and the other members of the Class have suffered significant losses and damages, and the value of their Charming Medical shares has been rendered worthless.

## JURISDICTION AND VENUE

15. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k, and 77o) and under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

16. This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

17. Venue is proper in this District pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27(a) of the Exchange Act (15 U.S.C. §78aa(a)) and 28 U.S.C. §1391(b). Charming Medical traded on the NASDAQ, and Defendants targeted investors, who reside in this District, with materially false and misleading statements throughout the Class Period. In addition, the Company's agent (Cogency Global) and the underwriter defendant (Cathay Securities) are located in this District.

18. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

19. Plaintiffs acquired the Company's securities pursuant and/or traceable to the Registration Statement and/or otherwise acquired the Company's securities at artificially inflated prices during the Class Period, and were damaged as a result of the federal securities law violations alleged herein.

20. Defendant Charming Medical is incorporated under the laws of the BVI with its principal executive offices located at Units 1803-1806, 18/F, Hang Lung Centre, 2-20 Paterson Street, Causeway Bay, Hong Kong, China. During the Class Period, Charming Medical's Class A ordinary shares traded on the NASDAQ under the ticker symbol "MCTA." Charming Medical benefitted from the Microcap Pump-and-Dump Scheme alleged herein because it was able to go public as part of such scheme, generating $7.36 million in gross proceeds.

21. Defendant Wong has served as the CEO, director, and chairman of the Board of Directors of the Company ("Board of Directors") at all relevant times. Wong was also the controlling shareholder of the Company before and after the completion of the IPO. Upon the completion of the IPO, Wong continued to own over 91% of the aggregate voting power and 68.19% of the total issued and outstanding Class A ordinary shares of the Company. Wong signed the misleading Registration Statement.

22. Defendant Cheung served as the Company's Chief Financial Officer during the Class Period. Cheung signed the misleading Registration Statement.

23. Defendant Yeung was a director of the Company during the Class Period. Yeung was also the chair of the audit committee of the Board of Directors. Yeung consented to being named in the Registration Statement as an independent director appointee. Yeung resigned from the Board of Directors on March 27, 2026.

24. Defendant Gung was a director of the Company during the Class Period. Gung was also a member of the audit committee of the Board of Directors. Gung consented to being named in the Registration Statement as an independent director appointee. Gung resigned from the Board of Directors on December 23, 2025, effective December 31, 2025.

25. Defendant Yu served as a director of the Company during the Class Period. Yu was also a member of the audit committee. Yu consented to being named in the Registration Statement as an independent director appointee.

26. Wong, Cheung, Yeung, Gung, and Yu are sometimes referred to herein as the "Individual Defendants."

27. Defendant Cathay Securities served as the Company's underwriter for the IPO. Cathay Securities' principal place of business is located in this District at 40 Wall Street, Suite 3600, New York, New York 10005. Cathay Securities benefitted from the Microcap Pump-and-Dump Scheme alleged herein because: (1) it received compensation pursuant to the underwriting agreement; (2) the scheme offered it the opportunity to sell 240,000 additional shares granted to it as a greenshoe option at highly inflated prices; and (3) Charming Medical's IPO allowed it to demonstrate its continued willingness to bring such manipulable low float IPOs to market and thereby to solicit future business from other Chinese (including Hong Kong) microcaps.

28. Defendant WWC was the Company's auditor during all relevant times. WWC's principal place of business is located at 2010 Pioneer Court, San Mateo, California 94403. WWC benefitted from the Microcap Pump-and-Dump Scheme alleged herein because: (1) it received compensation from the Company for consenting to being identified as the auditor and providing its services for the Registration Statement; (2) helping its client raise over $7 million made it more likely that it would generate future business from Charming Medical; and (3) Charming Medical's

IPO allowed it to demonstrate its continued willingness to help bring such manipulable low float IPOs to market and thereby to solicit future business from other Chinese (including Hong Kong) microcaps.

29. Defendant Cogency Global serves as the Company's U.S. agent to receive service of process. Cogency Global's principal place of business is located in this District at 122 E 42nd Street, 18th Floor, New York, New York 10168. Cogency Global benefitted from the Microcap Pump-and-Dump Scheme because: (1) it received compensation from the Company for acting as its U.S. Agent; and (2) being identified as Charming Medical's U.S. Agent in the Registration Statement allowed it to demonstrate its continued willingness to help bring such manipulable low float IPOs to market and thereby to solicit future business from other Chinese (including Hong Kong) microcaps.

30. The Individual Defendants each signed the defective Registration Statement or gave consent to be named in the Registration Statement as a director appointee and therefore possessed the power and authority to control its contents by insisting that misrepresentations and omissions be corrected, or by withholding his or her signature or consent until such corrections were made. The Individual Defendants were provided with copies of the Registration Statement alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent its issuance or to cause it to be corrected. The Individual Defendants are liable for the false and misleading statements and omissions pleaded herein.

31. Defendant WWC issued clean audit opinions on financial statements and consented to be listed as the auditor in the Registration Statement. Additionally, as the auditor at the time of the IPO, WWC had access to material non-public information. Because of its position, WWC knew that the adverse facts specified herein had not been disclosed to, and were being concealed from,

the public, and that the positive representations which were being made were materially false and/or misleading. WWC also knew, or recklessly ignored, that numerous other low-float Chinese IPOs to which it had lent its name were manipulated in pump-and-dump schemes at the cost of U.S. investors. WWC did not engage in a reasonable investigation prior to the IPO, and did not believe as a result of such investigation, that the Registration Statement was accurate and without omission at the time that it became effective. Therefore, WWC is also liable for the false statements pleaded herein.

32. Defendant Cathay Securities was the underwriter for Charming Medical's IPO, along with many other low float pump-and-dump IPOs of Chinese (including Hong Kong) microcap companies. As the underwriter, Cathay Securities is statutorily liable for misrepresentations and omissions under the Securities Act. Cathay Securities did not engage in a reasonable investigation prior to the IPO, and did not believe as a result of such investigation, that the Registration Statement was accurate and without omission at the time that it became effective.

33. Defendant Cogency Global was the Company's agent in the U.S. and lent its name to the Company's IPO. Due to its position, Cogency Global had the ability and opportunity to prevent issuance of the false and misleading Registration Statement, and/or cause it to be corrected, including by insisting that its name could not be used in the Registration Statement unless the misrepresentations and omissions were corrected. Therefore, it is also liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Company Background

34. Charming Medical is a small beauty care business providing TCM therapies from four storefronts in Hong Kong, China. It generated barely over $6 million in revenue for the fiscal

year that ended on March 31, 2025, and only small profits. The Company had fewer than 50 employees, most of whom either provided or sold the traditional therapies. Only ten (10) employees were involved in Management and Operations.

35. Besides its obscure business and minimal footprint, Charming Medical also had a working capital deficit of nearly $1.6 million in 2025. WWC expressed substantial doubt about its ability to continue as a going concern without raising IPO funds, because of the imbalance between its income and impending liabilities.

36. Wong controlled the Company with an interest of over 77.6% of Charming Medical's Class A ordinary shares before the IPO. Wong also controlled 100% of Charming Medical's Class B ordinary shares, each carrying 20 times the voting power of 1 Class A ordinary share. Critically, Wong controlled over 90% of the aggregate voting power both before and after the IPO. Public investors, who were a tiny minority, had no ability to meaningfully influence Charming Medical's decisions.

**Pump-and-Dump Schemes Involving Microcap Chinese Companies Were Escalating and Well-Documented Before Charming Medical Went Public**

37. A record number of Chinese companies went public in the United States in calendar year 2024. Amidst this increase, a significant number of frauds tied to microcap companies based in China emerged.

38. In calendar year 2025, the FBI observed a 300% increase compared to the previous year in complaints concerning pump-and-dump schemes related to microcap companies based in China that were principally orchestrated on social media (hereinafter the "Microcap Pump-and-

Dump Schemes”).[1] Purported stock tips were circulated in WhatsApp chatrooms, Twitter (X), and other social media platforms, pressuring investors to act quickly on a market-moving event.

39. Like Charming Medical, the targeted stocks concerned small Chinese companies with obscure businesses, little potential for growth, barely any revenue, small public floats, and tight control exercised by majority shareholders.

40. Manipulators act in concert with company insiders to pump up the stock price by disseminating misleading promotional statements in investor chatrooms and other social media platforms. The targets are almost always individual investors. Because of the small number of shares available to trade and the absence of neutral analyst coverage, stock prices rise dramatically after stock manipulators start buying shares. The stock manipulators then dump the shares on retail investors at artificially high prices, who are left holding the bag. In the worst scenarios, the stock is indefinitely halted, leaving the retail investors without the ability to sell their shares at any price.

41. On March 20, 2025, the Department of Justice seized $214 million from the U.S. bank accounts of promoters tied to China Liberal Education Holdings Ltd. (“CLEH”), a company based in China and incorporated in the Cayman Islands that purported to provide “consulting services . . . to improve campus information and data management systems” and “job readiness training to graduate students.” CLEH had gross revenue of only $2.9 million and operated at a net loss of $4.9 million in 2023. CLEH issued tens of millions of shares to accounts controlled by stock manipulators at $0.6 per share. The manipulators impersonated investment advisors, then drove up the price of the stock by disseminating false information on social media, and sold their CLEH holdings at as high as $7.75 a share, reaping hundreds of millions of dollars in profit.

---

[1] Federal Bureau of Investigation, *Fraudsters Target US Stock Investors through Investment Clubs Accessed on Social Media and Messaging Applications* (July 3, 2025), https://www.ic3.gov/PSA/2025/PSA250703.

42. The CLEH stock manipulation scheme was not an isolated incident. In the month of July 2025 alone, at least another 5 NASDAQ-listed Chinese or Asian companies were involved in pump-and-dump schemes before their stock prices collapsed by 84%-93%. Top King Win (NASDAQ: WAI) fell around 84% from July 3 to July 7, 2025; Park Ha Biological Technology Co., Ltd. (NASDAQ: PHH) fell around 93% on July 8, 2025; Concorde International Group (NASDAQ: CIGL) fell around 93% on July 10, 2025; Everbright Digital Holding (NASDAQ: EDHL) fell around 89% from July 11 to July 14, 2025; and Picocela (NASDAQ: PCLA) fell around 85.6% on July 15, 2025.

43. In September 2025, the co-CEO of Ostin Technology Group Co. ("Ostin") and a financial adviser were indicted after bilking investors out of more than $100 million by artificially inflating the shares of the China-based company. Ostin's stock price fell by approximately 93% upon the revelation of a pump-and-dump scheme on June 26, 2025. Incorporated in the Cayman Islands, Ostin claimed to supply "display modules and polarizers in China" and operated at a net loss of over $10 million in 2024.

44. Following these frauds, on September 4, 2025, NASDAQ filed a proposed rule with the SEC to adopt heightened initial listing standards for microcap companies that operated in China, including Hong Kong and Macau, requiring them to raise at least $25 million in IPO proceeds to list shares on the NASDAQ (the "Proposed Rule"). NASDAQ stated that the smaller offering sizes and public floats of these microcap Chinese securities made them more susceptible to manipulation.

45. On September 5, 2025, the SEC announced a cross-border task force to combat Microcap Pump-and-Dump Schemes involving microcap companies based in China. The task

force also focuses its enforcement efforts on auditors and underwriters who assist the companies with going public in the United States.

46. On September 18, 2025, the chairman of the SEC stated at an investor advisory committee meeting that the trend of foreign companies "incorporating in a jurisdiction, such as the Cayman Islands, that differs from where the company is headquartered [and] operates" behooves the SEC to consider whether "the current [disclosure] standard for [] foreign companies" no longer "make[s] sense."[2]

47. Between September 26, 2025 and October 16, 2025, the SEC halted trading for at least 8 companies involved in Microcap Pump-and-Dump Schemes. On December 3, 2025, the SEC chairman told Fox Business News that trading was halted for these companies because their securities were being manipulated. On March 22, 2026, the director of the SEC's trading and markets division told the Financial Times that "[p]ump-and-dump schemes among Chinese stocks are quite serious" and the SEC had learned from large retail brokers since the summer of 2025 that the issue was leading to substantial investor losses.[3]

48. On February 20, 2026, NASDAQ filed another proposed rule change with the SEC concerning delisting companies whose stock had been suspended from trading by the SEC. NASDAQ "believe[d] that the ability of third parties to manipulate a security's price can indicate

---

[2] Paul S. Atkins, *Remarks at the Investor Advisory Committee Meeting*, SEC (Sept. 18, 2025), https://www.sec.gov/newsroom/speeches-statements/atkins-091825-remarks-investor-advisory-committee-meeting (last visited June 8, 2026).

[3] Sun Yu and Cheng Leng, *Chinese IPOs in US falter amid scrutiny of manipulation schemes*, FINANCIAL TIMES (Mar. 22, 2026), https://www.ft.com/content/6e972cbf-c8d5-420f-8f7c-9ae26a8c07fe?syn-25a6b1a6=1 (last visited June 8, 2026).

that the security does not have sufficient liquidity, and the issuing company does not have sufficient market interest, for listing to be appropriate."[4]

49. Congress has also started to pay attention to Microcap Pump-and-Dump Schemes. On March 19, 2026, the U.S. Senate banking committee sent a bipartisan letter to the chairman of the SEC, highlighting the "deceptive social-media campaigns" related to market manipulation of the Asia-based companies that the SEC suspended for schemes to inflate price and volume. In the letter, Senators Tim Scott and Elizabeth Warren demanded that the SEC focus on protecting investors from risks to "market integrity and investor protection posed by . . . entities with ties to [China]."

**Microcap Pump-and-Dump Schemes Lead to Long-Term Trading Halts**

50. Under Section 12(k)(1)(A) of the Exchange Act, the SEC has authority to suspend trading for a period of up to 10 business days if it believes it is in the public interest and protects investors. 15 U.S.C. § 78l(k)(1)(A). The SEC can halt trading when there is potential market manipulation.[5]

51. NASDAQ also has the ability to halt trading of a security indefinitely when it requests from the issuer information necessary to protect investors and the public interest. *See, e.g.*, NASDAQ Rule 4120(a)(5).

52. Historically, most companies subject to the 10-day SEC trading halts are those traded in the Over the Counter (OTC) market, and trading halts are lifted after the company provides the requested information.[6] A 10-day SEC trading halt is highly unusual. In 2022, the

---

[4] https://www.federalregister.gov/documents/2026/06/08/2026-11379/self-regulatory-organizations-the-nasdaq-stock-market-llc-noticing-of-filing-of-amendment-no-1-and
[5] SEC, *Investor Bulletin: Trading Suspensions* (May 2012), at 1, https://www.sec.gov/files/tradingsuspensions.pdf.
[6] https://www.finra.org/investors/investing/investment-products/stocks/trading-halts-delays-suspensions.

SEC suspended trading of only 2 securities. In 2023, the SEC suspended trading of only 4 securities.

53. For example, in 2013, the SEC suspended trading for 61 empty shell microcap companies that were thinly traded and "ha[d] great potential to be hijacked by fraudsters who falsely hype the stock to portray it as a thriving company and coerce investors into 'pump-and-dump' schemes."

54. In 2014, the SEC suspended over 234 microcap companies to similarly combat "microcap fraud."[7]

55. In 2024, the only two instances where trading was suspended by the SEC involved Microcap Pump-and-Dump Schemes.

56. Because companies with halted securities generally want trading to resume, they almost always provide all information and abide by other requests of the SEC and the listing exchange. Or, if the listing exchange refuses to resume trading on its venue, the companies can switch to a lesser venue such as the OTC or Pink Sheets to resume trading. Only the most severe frauds, or companies looking to abandon the U.S. investors that bought into the IPO, never resume trading.

**Tell Tale Signs of Microcap Pump-and-Dump Schemes**

57. Several factors are common in Microcap Pump-and-Dump Schemes. They all have small operations, generally peddle obscure products or services, and are dominated by one or more controlling shareholders who also serve as the principal managers of the company.

---

[7] Stephanie Russell-Kraft, *SEC Suspends 225 Companies In Microcap-Fraud Crackdown*, LAW360 (Feb. 3, 2014), https://www.law360.com/articles/506560; SEC, *SEC Suspends Trading in Nine Penny Stocks in Ongoing Initiative to Combat Microcap Fraud* (Sept. 25, 2014), https://www.sec.gov/newsroom/press-releases/2014-215.

58. The limited float of initial offerings enables manipulators to move a stock price without deploying much capital, because they only need to acquire or influence a small number of shares.

59. The presence of a controlling shareholder significantly helps to reduce the number of shares available to trade (the public float), thereby making it easier for manipulators to acquire a critical mass of shares to manipulate the prices.

60. The other Microcap Pump-and-Dump Scheme companies Cathay Securities brought public show that at least 3 of the 4 telltale signs were present: Chinese/Asian ownership, suspicious business practices, little to no income, and tight control exercised by majority shareholders. *See* ¶69.

61. Several companies involved in Microcap Pump-and-Dump Schemes have relied on the same gatekeepers to go public, including most of the Gatekeeper Defendants named in this Complaint.

**The Gatekeeper Defendants Repeatedly Facilitated Microcap Pump-and-Dump Schemes**

62. Cathay Securities is the leading underwriter for microcap frauds originated in China. A Bloomberg investigation identified that approximately 50% of the IPOs Cathay Securities underwrote were linked to Microcap Pump-and-Dump Schemes.

63. WWC has served as the auditor for several Microcap Pump-and-Dump Schemes. A 2023 study from the University of Melbourne also identified WWC as one of the small company auditors most frequently associated with high dollar losses from NASDAQ-listed IPOs.

64. Cogency Global has also served as the U.S. agent for numerous companies subject to Microcap Pump-and-Dump Schemes.

***Cathay Securities***

65. From August 2024 through October 2025, Cathay Securities served as the underwriter of 18 IPOs, all of which were China-based or other Asian microcap companies.

66. For instance, Cathay Securities underwrote the IPO of Pheton, a healthcare company incorporated in the Cayman Islands and headquartered in China. Pheton had only 11 employees and $628,591 in yearly revenue when it went public in September 2024. Cogency Global served as the U.S. agent for Pheton. The stock had an IPO price of $4.

67. Pheton's stock price rocketed to $30.96 on July 28, 2025. In the weeks leading up to that massive increase in price, stock manipulators circulated a Power Point in a WhatsApp group stating that Gilead Sciences was expected to purchase a 30% stake in Pheton, and make a $60-80 million upfront payment to Pheton for licensing radiotherapy technologies. This was false.

68. On July 29, 2025, Pheton's stock price cratered when a popular forensic analysis site, The Bear Cave, published a report explaining how Pheton's stock was manipulated. Pheton's stock price collapsed by around 95% as a result.




*Figure 1 Pheton (later renamed to iTonic) Stock Price Chart Around July 28, 2025*

69. In fact, out of the eighteen (18) IPOs Cathay Securities underwrote from August 2024 through October 2025,[8] ten (10) were involved in Microcap Pump-and-Dump Schemes.[9] All ten were promoted by stock manipulators in WhatsApp,[10] and four were subsequently suspended

---

[8] https://www.cathaysecurities.com/#/recentTransactions (last visited June 11, 2026).

[9] The 10 companies were Charming Medical (NASDAQ:MCTA); TechCreate Group Ltd. (NASDAQ:TCGL); CCH Holdings Ltd. (NASDAQ:CCHH); NUSATRIP INCORPORATED (NASDAQ:NUTR); Pitanium Limited (NASDAQ:PTNM); EPWK Holdings Ltd. (NASDAQ:EPWK); Samfine Creation Holdings Group Limited (NASDAQ:SFHG); Pheton Holdings Ltd (NASDAQ:PTHL); Reitar Logtech Holdings Limited (NASDAQ:RITR); and Star Fashion Culture Holdings Limited (NASDAQ:STFS). *See also* Bloomberg, *Wall Street's Stamp of Legitimacy Fuels Suspected Pump-and-Dump Schemes* (Jan. 29, 2026) (highlighting nearly 50% of deals underwritten by Cathay Securities later became target of apparent pump-and-dump schemes), *available at* https://www.bloomberg.com/graphics/2026-wall-street-apparent-pump-and-dump-investor-scam/?terminal=1 [https://archive.is/R568Q].

[10] https://www.stopnasdaqchinafraud.com; https://www.reddit.com/r/VampireStocks/comments/1irg7vk/epwk/ (EPWK); https://www.reddit.com/r/Scams/comments/1gwm6an/whatsapp_investment_group_claiming_to_be_bernard/ (SFHG)

from trading by the SEC because of the risk of manipulation. Like Charming Medical, all had Chinese/Asian ownership, suspicious business practices, little to no income, and tight control exercised by majority shareholders. The following chart illustrates Cathay Securities' deep involvement in Microcap Pump-and-Dump Schemes before Charming Medical went public, often with the assistance of Defendants WWC and Cogency Global:

| Company (Place of Incorporation)[11] | Business | Controlling Shareholders[12] | Net Income (Loss) | Auditor | Registered Agent | IPO Date | Date Trading Suspended | Price Peak Date | Drop After Price Peak |
|---|---|---|---|---|---|---|---|---|---|
| TechCreate Group Ltd. (CI) | Real Time Payment | Y | ($750k) | Audit Alliance LLP | **Cogency Global Inc.** | 10/15/2025 | 2/2/2026 | 1/30/2026 | N/A trading suspended |
| CCH Holdings Ltd (CI) | Hotpot Restaurant in Malaysia | Y | $913k | ST & Partners PLT | **Cogency Global Inc.** | 10/3/2025 | n/a | 12/11/2025 | ~96% |
| **Charming Medical (BVI)** | **TCM Beauty Therapies** | **Y** | **$1.2M** | **WWC, P.C.** | **Cogency Global Inc.** | **10/21/2025** | **11/12/2025** | **11/11/2025** | **N/A trading suspended** |
| ***NUSATRIP INCORPORATED (Nevada)*** | ***Travel Agency*** | ***Y*** | ***($787k)*** | ***Onestop Assurance PAC*** | ***Self*** | ***8/15/2025*** | ***10/9/2025*** | ***10/6/2025*** | ***N/A trading suspended*** |
| ***Pitanium Limited (BVI)*** | ***Beauty Products*** | ***Y*** | ***$1.1M*** | ***Enrome LLP*** | ***Cogency Global Inc*** | ***5/30/2025*** | ***10/6/2025*** | ***10/1/2025*** | ***N/A trading suspended*** |
| ***Reitar Logtech Holdings Limited (CI)*** | ***Logistics Property Operation*** | ***Y*** | ***$2.5M*** | ***WWC, P.C.*** | ***Cogency Global Inc*** | ***8/23/2024*** | ***n/a*** | ***9/29/2025*** | ***~77%*** |
| ***Star Fashion Culture Holdings Limited (CI)*** | ***Fashion Marketing*** | ***Y*** | ***$1.1M*** | ***Enrome LLP*** | ***Cogency Global Inc*** | ***10/11/2024*** | ***n/a*** | ***8/8/2025*** | ***~94%*** |
| ***Pheton Holdings Ltd (CI)*** | ***Brachytherapy Treatment Planning System*** | ***Y*** | ***($241k)*** | ***Marcum Asia CPAs LLP*** | ***Cogency Global Inc*** | ***9/5/2024*** | ***n/a*** | ***7/28/2025*** | ***~95%*** |

[11] CI = Cayman Islands; BVI = British Virgin Islands.
[12] Principal shareholders with ownership or voting power of more than 50%.

| Company (Place of Incorporation)[11] | Business | Controlling Shareholders[12] | Net Income (Loss) | Auditor | Registered Agent | IPO Date | Date Trading Suspended | Price Peak Date | Drop After Price Peak |
|---|---|---|---|---|---|---|---|---|---|
| ***EPWK HOLDINGS LTD. (CI)*** | ***Crowd sourcing for small or medium businesses*** | ***Y*** | ***($1.2M)*** | ***<u>WWC, P.C.</u>*** | ***<u>Cogency Global Inc.</u>*** | ***2/6/2025*** | ***n/a*** | ***6/5/2025*** | ***~96%*** |
| ***Samfine Creation Holdings Group Limited (CI)*** | ***Printing Service Provider*** | ***Y*** | ***($433k)*** | ***<u>WWC, P.C.</u>*** | ***<u>Cogency Global Inc.</u>*** | ***10/15/2024*** | ***n/a*** | ***12/9/2024*** | ***~97%*** |

*"Pump-and-Dumps" that were revealed before Charming Medical went public are ***italicized and in bold***. Instances where either WWC or Cogency also acted as advisors for the IPO with Cathay Securities are underlined.

70. Strikingly, Cathay Securities was the underwriter of seven (7) separate low float IPOs involved in Microcap Pump-and-Dump Schemes ***before*** Charming Medical went public on October 21, 2025. In three of those instances, WWC and Cogency Global also served as the auditor and U.S. agent.

71. In addition, Cathay Securities served as the underwriter for two companies that had already been suspended from trading before Charming Medical's IPO following a Microcap Pump-and-Dump Scheme.

72. Cathay Securities admitted actual knowledge about the Microcap Pump-and-Dump Schemes and their nature, going so far as to acknowledge the risks in a notice posted on its website on October 10, 2025, nearly two weeks before Charming Medical's IPO:

> ***Cathay Securities Inc. has become aware of individuals and groups falsely claiming an affiliation with our Firm—often using platforms such as WhatsApp, WeChat, Telegram, Discord, and similar messaging apps.***
>
> Important:
>
> We are not affiliated with any Financial Advisors, FAs, Brokers or Investment Firms or ***Investors on signal groups on WhatsApp, WeChat, Telegram, Discord, or similar platforms***.
>
> (emphasis added).

73. Cathay Securities was not so candid in the Registration Statement, where this known risk was omitted altogether and no mention was made of potential manipulation, or even investor messaging on WhatsApp and WeChat.

***WWC***

74. In 2022, WWC was sanctioned by the Public Company Accounting Oversight Board (PCAOB) for using its unregistered Hong Kong affiliates to perform auditing work and failing to reasonably supervise the Hong Kong affiliates to prevent violations of the Sarbanes-Oxley Act and PCAOB rules.

75. In addition to the three (3) stocks that were the targets of the Microcap Pump-and-Dump Schemes that Cathay Securities underwrote before the Charming Medical IPO, WWC was also the auditor for QMMM Holdings Ltd (NASDAQ: QMMM).

76. Headquartered in Hong Kong, China, QMMM went public in July 2024 and offered 40 million new shares in June 2025. The company had 28 employees and around $1.3 million in annual net losses. In August 2025, QMMM's stock price surged by over 100% as a result of the Microcap Pump-and-Dump Scheme. In September, its stock price rose to over $300 from $7 before the SEC suspended trading on September 26, 2025, or nearly a month before the Charming Medical IPO.

77. All told, before Charming Medical went public, WWC was the auditor for at least 4 companies involved in the Microcap Pump-and-Dump Schemes.

***Cogency Global***

78. In addition to lending its name and services to the six (6) IPOs involved in Microcap Pump-and-Dump Schemes that were underwritten by Cathay Securities before the Charming

Medical IPO, Cogency Global also served as the U.S. agent for CLEH and QMMM. *See* ¶¶41, 75-76.

79. Cogency Global was also the U.S. agent for Cuprina Holdings (Cayman) Ltd., whose stock was similarly pumped, peaking on August 14, 2025 before its collapse. It was also the U.S. agent for Smart Digital Group, whose stock was pumped and peaked on September 24, 2025 followed by a suspension from trading on September 26, 2025.

80. All told, before Charming Medical went public, Cogency Global was the U.S. agent for at least ten (10) companies linked to Microcap Pump-and-Dump Schemes.

**Charming Medical Used Gatekeepers With a Known Record of Pump-and-Dump Schemes and Went Public Despite Warning Signs That the Company Was Susceptible to a Microcap Pump-and-Dump Scheme**

81. On November 21, 2024, Charming Medical engaged Cathay Securities as the underwriter and WWC as the auditor for its forthcoming IPO. Cogency Global served as Charming Medical's U.S. agent.

82. On May 14, 2025, the Company filed its registration statement with the SEC on Form F-1, seeking to raise only $7.36 million ("Registration Statement"). Its IPO would not have been possible under the September 2025 NASDAQ Proposed Rule, which was eventually adopted by the SEC on May 14, 2026, raising the minimum IPO proceeds requirement to $25 million. *See* ¶44.

83. To avoid having to face the Proposed Rule, on September 10, 2025, the Company quickly finalized its Registration Statement with its third and last amendment, and asked the SEC to accelerate effectiveness on September 29, 2025. As a result of that request, the Registration Statement became effective on September 30, 2025.

84. The Company filed its prospectus in connection with the IPO with the SEC on October 21, 2025 (the "Prospectus"), which became part of the Registration Statement since it

contained language that was not identical to the one filed on the effective date. By that time, Microcap Pump-and-Dump Schemes had become rampant. *See* ¶¶43-47, 69.

85. Despite its highly misleading statements and omissions, Wong and Cheung signed the Registration Statement, and Yeung, Gung, and Yu each gave consent to being named in the Registration Statement as an independent director appointee.

86. For the IPO, Charming Medical issued 1.6 million Class A ordinary shares to the public, with an over-allotment option of 240,000 Class A ordinary shares, generating proceeds to the Company of $7.36 million and underwriting fees of $515,200 (in addition to the over-allotment or greenshoe option, which significantly boosted the underwriter's compensation). Before the IPO, Charming Medical had an aggregate of 13,338,000 Class A ordinary shares outstanding. Including Class B ordinary shares, after the IPO, the Company's public float was less than 12.12%, designed to make it an easy target for manipulation.

87. The Company's common stock began trading on the NASDAQ on October 21, 2025 under the ticker symbol "MCTA" at an initial offering price of $4 per share.

88. Charming Medical raised approximately $6.8 million in net proceeds from investors after deducting underwriting discounts.

## **FALSE AND MISLEADING STATEMENTS**

89. The defective Registration Statement discouraged investors from doing their own due diligence, and instead directed investors to rely ***only*** on the information provided or incorporated into that document: "[y]ou should not rely upon any information about us that is not contained in this prospectus or in one of our public reports filed with the [SEC] and incorporated into this prospectus." None of the manipulation warnings on Cathay Securities' website were

included or incorporated. Instead, the Registration Statement made only boilerplate statements about risks that were materially false and misleading when made.

90. The defective Registration Statement stated the following about hypothetical risks related to liquidity, value and investor losses:

> ***There has been no public market for our Class A Ordinary Shares, prior to this Offering, and you may not be able to resell our Class A Ordinary Shares at or above the price you paid, or at all.***
>
> Our Class A Ordinary Shares have been approved for listing on the Nasdaq Capital Market, ***however, we cannot assure you that a liquid public market for our Class A Ordinary Shares will develop. If an active public market for our Class A Ordinary Shares does not develop following the completion of this Offering, the market price of our Class A Ordinary Shares may decline and the liquidity of our Class A Ordinary Shares may decrease significantly.***
>
> The initial public offering price for our Class A Ordinary Shares was determined by negotiation between us and the underwriters and may vary from the market price of our Class A Ordinary Shares following our initial public offering. ***We cannot assure you that the price at which the Class A Ordinary Shares are traded after this Offering will not decline below the initial public offering price. If you purchase our Class A Ordinary Shares in our initial public offering, you may not be able to resell those shares at or above the initial public offering price***. We cannot assure you that the initial public offering price of our Class A Ordinary Shares, or the market price following our initial public offering, will equal or exceed prices in privately negotiated transactions of our shares that have occurred from time to time prior to our initial public offering.

91. The statements identified in Paragraph 90 were materially false and misleading when made because they omitted to disclose the following: (a) that Charming Medical's profile and structure, including a low public float, made it extremely susceptible to a pump-and-dump scheme which was highly likely to make it impossible to "resell [its] Class A Ordinary Shares at or above the price [an investor] paid"; (b) that the Gatekeeper Defendants had facilitated numerous Microcap Pump-and-Dump Schemes in the last two years before the IPO (including schemes involving ***more than half*** of the Asian microcap IPOs brought public by Cathay Securities, *see* ¶69), substantially increasing the likelihood that the liquidity, value, and trading of Charming

Medical would be impacted by such a scheme; (c) that the IPO had been timed to avoid a new NASDAQ rule intended to thwart manipulation of low-float IPOs like this; and (d) that manipulation of similar Chinese or other Asian IPOs brought public by the Gatekeeper Defendants had been so severe that trading was halted in some cases, or in others they were identified by the press and analysts as examples of Microcap Pump-and-Dump Schemes, increasing the likelihood that investors in this IPO would face a pump-and-dump and/or trading halt.

92. The Registration Statement stated the following concerning price volatility, volume and the perceived risks of companies based in Hong Kong and Mainland China:

> ***We may experience extreme stock price volatility unrelated to our actual or expected operating performance, financial condition or prospects, making it difficult for prospective investors to assess the rapidly changing value of our Class A Ordinary Shares, which could result in substantial losses to you***.
>
> …
>
> ***The market price of our Class A Ordinary Shares is likely to be volatile and could fluctuate widely due to factors beyond our control.*** This may happen due to broad market and industry factors, such as performance and fluctuation in the market prices or underperformance or deteriorating financial results of other listed companies based in Hong Kong and Mainland China. The securities of some of these companies have experienced significant volatility since their initial public offerings, including, in some cases, substantial price declines in the trading price of their securities. ***The trading performances of other Hong Kong and Chinese companies' securities after their offerings may affect the attitudes of investors towards Hong Kong-based, U.S.-listed companies, which consequently may affect the trading performance of our Class A Ordinary Shares, regardless of our actual operating performance. In addition, any negative news or perceptions about inadequate corporate governance practices or fraudulent accounting, corporate structure or matters of other Hong Kong and Chinese companies may also negatively affect the attitudes of investors towards Hong Kong and Chinese companies in general, including us, regardless of whether we have conducted any inappropriate activities. Furthermore, securities markets may from time to time experience significant price and volume fluctuations that are not related to our operating performance, which may have a material and adverse effect on the trading price of our Class A Ordinary Shares.***

93. The statements identified in Paragraph 92 were materially false and misleading when made because they omitted to disclose the following: (a) that Charming Medical was not

simply analogous to "other Hong Kong and Chinese companies," many of which had successful IPOs, but rather was part of a small subset of low-float IPOs brought by questionable gatekeepers that are highly susceptible to, and often intended for, a Microcap Pump-and-Dump Scheme; (b) that the Gatekeeper Defendants had facilitated numerous Microcap Pump-and-Dump Schemes in the last two years before the IPO (including schemes involving ***more than half*** of the Asian microcap IPOs brought public by Cathay Securities, *see* ¶69), substantially increasing the likelihood that the volatility of Charming Medical would be impacted by such a scheme; (c) that the IPO had been timed to avoid a new NASDAQ rule intended to thwart manipulation of low-float IPOs like this; (d) that manipulation of similar Chinese or other Asian IPOs brought public by the Gatekeeper Defendants had been so severe that trading was halted in some cases, or in others they were identified by the press and analysts as examples of microcap pump-and-dump schemes, increasing the likelihood that investors in this IPO would face a pump-and-dump and/or trading halt; and (e) as a result: (i) Charming Medical was highly likely to experience extreme volatility, (ii) negative investor attitudes were likely to develop as a result of the pump-and-dump scheme, and (iii) the negative investor attitudes were not limited to topics such as fraudulent accounting or corporate governance practices.

94. The hypothetical stock price volatility risk disclosure continued:

> Recently, there have been instances of extreme stock price run-ups followed by rapid price declines and strong stock price volatility with a number of recent initial public offerings, especially among companies with relatively smaller public floats. ***As a relatively small-capitalization company with relatively small public float, we may experience greater stock price volatility, extreme price run-ups, lower trading volume and less liquidity than large-capitalization companies. In particular, our Class A Ordinary Shares may be subject to rapid and substantial price volatility, low volumes of trades and large spreads in bid and ask prices. Such volatility, including any stock-run up, may be unrelated to our actual or expected operating performance, financial condition or prospects, making it difficult for prospective investors to assess the rapidly changing value of our Class A Ordinary Shares.***

> In addition, if the trading volumes of our Class A Ordinary Shares are low, persons buying or selling in relatively small quantities may easily influence prices of our Class A Ordinary Shares. This low volume of trades could also cause the price of our Class A Ordinary Shares to fluctuate greatly, with large percentage changes in price occurring in any trading day session. Holders of our Class A Ordinary Shares may also not be able to readily liquidate their investment or may be forced to sell at depressed prices due to low volume trading. Broad market fluctuations and general economic and political conditions may also adversely affect the market price of our Class A Ordinary Shares. As a result of this volatility, investors may experience losses on their investment in our Class A Ordinary Shares. A decline in the market price of our Class A Ordinary Shares also could adversely affect our ability to issue additional shares of Class A Ordinary Shares or other securities and our ability to obtain additional financing in the future. No assurance can be given that an active market in our Class A Ordinary Shares will develop or be sustained. If an active market does not develop, holders of our Class A Ordinary Shares may be unable to readily sell the shares they hold or may not be able to sell their shares at all.

95. The statements identified in Paragraph 94 were materially false and misleading when made because they omitted to disclose the following: (a) that there was ***already*** a high risk that Charming Medical would become the target of a pump-and-dump scheme (more than 50% from the track record of Cathay Securities' IPOs alone); (b) that the Gatekeeper Defendants had facilitated numerous Microcap Pump-and-Dump Schemes in the last two years before the IPO, substantially increasing the likelihood that the volatility of Charming Medical would be impacted by such a scheme; (c) that the IPO had been timed to avoid a new NASDAQ rule intended to thwart manipulation of low-float IPOs like this; (d) that manipulation of similar Chinese or other Asian IPOs brought public by the Gatekeeper Defendants had been so severe that trading was halted in some cases, or in others they were identified by the press and analysts as examples of microcap pump-and-dump schemes, increasing the likelihood that investors in this IPO would face a pump-and-dump and/or trading halt; and (e) as a result: (i) Charming Medical's stock was highly likely to experience extreme volatility, and (ii) volatility was not limited to having "less liquidity" than larger companies but was enhanced by contracting with gatekeepers known for facilitating pump-and-dumps.

96. The Registration Statement stated the following with respect to the risk of being delisted from an exchange:

> ***If we cannot satisfy, or continue to satisfy, the initial listing requirements and other rules of Nasdaq Capital Market, although we are exempt from certain corporate governance standards applicable to US issuers as a Foreign Private Issuer, our Class A Ordinary Shares may not be listed or may be delisted, which could negatively impact the price of our Class A Ordinary Shares and your ability to sell them.***
>
> ***Even though our Class A Ordinary Shares have been listed on the Nasdaq Capital Market, we cannot assure you that our Class A Ordinary Shares will continue to be listed on the Nasdaq Capital Market.***
>
> …
>
> Even if we initially meet the listing requirements and other applicable rules of the Nasdaq Capital Market, we may not be able to continue to satisfy these requirements and applicable rules. If we are unable to satisfy the Nasdaq Capital Market criteria for maintaining our listing, our Class A Ordinary Shares could be subject to delisting.
>
> If the Nasdaq Capital Market delists our Class A Ordinary Shares from trading, we could face significant consequences, including:
>
> - a limited availability for market quotations for our Class A Ordinary Shares;
> - reduced liquidity with respect to our Class A Ordinary Shares;
> - a determination that our Class A Ordinary Share is a "penny stock" which will require brokers trading in our Class A Ordinary Shares to adhere to more stringent rules and possibly result in a reduced level of trading activity in the secondary trading market for our Class A Ordinary Shares;
> - limited amount of news and analyst coverage; and
> - a decreased ability to issue additional securities or obtain additional financing in the future.

97. The statements identified in Paragraph 96 were materially false and misleading when made because they omitted to disclose the following: (a) that there was ***already*** a high risk that Charming Medical would become the target of a pump-and-dump scheme (more than 50% from the track record of Cathay Securities' IPOs alone); (b) that the Gatekeeper Defendants had

facilitated numerous Microcap Pump-and-Dump Schemes in the last two years before the IPO, substantially increasing the likelihood that the volatility of Charming Medical would be impacted by such a scheme; (c) that the IPO had been timed to avoid a new NASDAQ rule intended to thwart manipulation of low-float IPOs like this; (d) that manipulation of similar Chinese or other Asian IPOs brought public by the Gatekeeper Defendants had been so severe that trading was halted and/or the stock delisted, increasing the likelihood that investors in this IPO would face a halt or delisting; and (e) as a result, the Company's stock was highly likely to be indefinitely halted or delisted and investors were highly likely to lose the value of their investments.

98. The Registration Statement contained the following false and misleading statements concerning whether NASDAQ may adopt additional criteria for continuing listing on the exchange:

> ***Nasdaq may apply additional and more stringent criteria for our continued listings due to the relatively small size of this offering and the fact that our insiders hold a large portion of our listed securities after this offering.***
>
> Nasdaq Listing Rule 5101 provides Nasdaq with broad discretionary authority over the initial and continued listing of securities on Nasdaq, ***and Nasdaq may use such discretion to apply additional or more stringent criteria for the continued listing of particular securities, or suspend or delist particular securities based on any event, condition, or circumstance that exists or occurs that makes continued listing of the securities on Nasdaq inadvisable or unwarranted in the opinion of Nasdaq, even though the securities may meet all enumerated criteria for initial or continued listing on Nasdaq. In addition, Nasdaq has used its discretion to deny initial or continued listing or to apply additional and more stringent criteria in the instances, including, but not limited to***: (i) where the company engaged an auditor that has not been subject to an inspection by PCAOB, an auditor that PCAOB cannot inspect, or an auditor that has not demonstrated sufficient resources, geographic reach, or experience to adequately perform the company's audit; (ii) where the company planned a small public offering, which would result in insiders holding a large portion of the company's listed securities, and Nasdaq had concerns that the offering size was insufficient to establish the company's initial valuation, and there would not be sufficient liquidity to support a public market for the company; and (iii) where the company did not demonstrate sufficient nexus to the U.S. capital market, including having no U.S. shareholders, operations, or members of the board of directors or management. Our initial public offering is relatively small. The insiders of our Company still hold a large portion of the

> Company's listed securities after the Offering. ***Therefore, we may be subject to the additional and more stringent criteria of Nasdaq for our continued listing in the future***.

99. The statements identified in Paragraph 98 were materially false and misleading when made because they omitted to disclose the following: (a) that NASDAQ had ***already*** proposed to the SEC a rule to prevent the very type of low-float Chinese IPO fraud that destroyed Charming Medical; (b) that the reasons behind the Proposed Rule and the actual risks facing Charming Medical investors were not just limited to "liquidity" but rather included designed Microcap Pump-and-Dump Schemes; (c) that Charming Medical would become the target of a pump-and-dump scheme necessitating the need for NASDAQ's proposed rule banning similar IPOs; and (d) the Gatekeeper Defendants had facilitated numerous Microcap Pump-and-Dump Schemes in the last two years before the IPO (including schemes involving ***more than half*** of the Asian microcap IPOs brought public by Cathay Securities, *see* ¶69), substantially increasing the likelihood that the volatility of Charming Medical would be impacted by such a scheme.

**The Registration Statement Failed to Comply With SEC Regulation S-K's Heightened Disclosure Requirements**

100. SEC Regulation S-K required Defendants to describe, in the Registration Statement, all ***material*** factors that made an investment in Charming Medical risky or speculative. Item 105 of Regulation S-K discourages boilerplate or generic risk disclosures like the materially misleading statements contained in the Registration Statement. 17 C.F.R. § 229.105(a).

101. Instead, the discussion of risk factors must be specific to the particular company and its operations, and must explain how the risk affects the company and/or the securities being offered. Generic or boilerplate attempts to disclose potential risks like the misleading disclosures in the Registration Statement cannot shield Defendants from liability, and could not tell investors how the specific risks could affect their investment. *See* Statement of the Comm'n Regarding

Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers, 1998 WL 425894, at *14 (July 29, 1998).

102. Further, Item 303 required the Registration Statement to disclose material trends or uncertainties reasonably likely to impact Charming Medical's results of operations or financial condition. 17 C.F.R. § 229.303(b)(2)(ii).

103. Item 3 of Form F-1 requires issuers to "[f]urnish the information required by Item 105 . . . of Regulation S-K."[13] And "the SEC has stated that its interpretations of Item 303 apply to Management Discussion & Analysis [MD & A] disclosures drafted pursuant to Item 5 of Form 20-F [that applies] to foreign corporations." *Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 619 n.5 (S.D.N.Y. 2021); *see also Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 598 (S.D.N.Y. 2022) (finding that foreign companies are required to comply with Item 303 of Regulation S-K).

104. The SEC has emphasized that the disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." S.E.C. Release No. 6835, 1989 WL 1092885, at *3, *17. Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See* Comm'n Guidance Regarding Mgmt.'s Discussion and Analysis of Fin. Condition and Results of Operations, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (Dec. 19, 2003).

---

[13] SEC, *Form F-1*, at 6, https://www.sec.gov/files/formf-1.pdf.

105. Under Item 303, even if a defendant cannot determine whether an uncertainty will occur, disclosure is still required unless the defendant affirmatively determines that no material effect is reasonably likely.

106. Put simply, Items 105 and 303 required Defendants to disclose that Charming Medical was virtually certain to be the subject of a Microcap Pump-and-Dump Scheme, and prohibited the Defendants from relying on generic risks that could apply to virtually any other microcap company traded on the NASDAQ.

107. Defendants failed to comply with Regulation S-K's rigorous disclosure requirements by failing to disclose: (a) the known uncertainty that Charming Medical was likely to be manipulated by a pump-and-dump scheme; (b) the known uncertainty that Charming Medical used gatekeepers for its IPO with a history of facilitating such schemes, including the linking of more than half of Cathay Securities' recent Chinese microcap IPOs to such schemes; (c) the known uncertainty of a trading halt related to manipulative trading; and (d) the known adverse trend that by the time Charming Medical went public, the SEC had suspended trading of eight (8) China/Asia microcap companies for the materialization of these exact risks. *See* ¶¶37-86.

**The Truth Begins to Emerge**

108. Within ten days after Charming Medical went public, the price of the Company's common stock rose to nearly $20 as stock manipulators spread false information online:[14]

[14] https://x.com/Bezel4455/status/1983962929276899457 (last visited June 1, 2026); https://x.com/TradeSnapHQ/status/1983987537451352438 (last visited June 1, 2026); https://x.com/WilliamLucasn/status/1983989126824391074 (last visited June 1, 2026).

**Jon henson**
@Bezel4455

$MCTA Up 33% 🚀🔥

🔹 Fresh IPO momentum — Hong Kong–based wellness & TCM beauty brand soaring 🌿
🔹 Launched on Nasdaq Oct 21 at $4, now surging on heavy volume 💥
🔹 Tiny float + strong debut = trader magnet ⚡
🔹 Early-stage profits and expanding wellness centers across Asia 🌏

Eyes on $MCTA — could this new IPO keep the magic going? 👀
Not a recommendation. Trade at your own risk.

1:23 PM · Oct 30, 2025 · **478** Views

**TradeSnap** @TradeSnapHQ · Oct 30, 2025
Today's Top 5 Gainers Report:
$BQ (102%)
**$MCTA** (45%)
$AQMS (40%)
$HBIO (38%)
$EBS (37%)

Get live stock alerts at tradethehalt.com

#StocksToBuy #StockMarket #Stocks #investing #Daytrading

204

**William** 🇺🇸 @WilliamLucasn · Oct 30, 2025
Top Gainers

$INTS $BQ **$MCTA** $AQMS $MSAI

133

109. The Microcap Pump-and-Dump Scheme caused the price of Charming Medical's stock to peak on November 11, 2025 after stock manipulators relentlessly created false hype on both Twitter (X)[15] and WhatsApp chatrooms:[16]

---

[15] https://x.com/TheREALAishaMAC/status/1988205266387824700 (last visited June 1, 2026).
[16] https://www.stopnasdaqchinafraud.com/?id=aa8698ad-3552-4872-bfb3-878004b0d14c (last visited June 1, 2026).







110. On November 11, 2025, 4.2 million shares were traded at high prices between $25.90 and $31.70 per share.

111. After the market closed on November 11, 2025, the SEC issued an order (the "SEC Order") suspending trading in the Company's stock from November 12, 2025 to November 25,

2025 because of "potential manipulation in the securities of [Charming Medical] effectuated through recommendations made to investors by unknown persons via social media to purchase, hold, and/or sell the securities of [Charming Medical] and to send screenshots documenting their transaction. These recommendations appear to be designed to artificially inflate the price and volume of the securities of [Charming Medical]."[17]

112. On November 26, 2025, citing the SEC Order, NASDAQ announced that trading in Charming Medical stock would remain suspended until the Company provided additional information requested by NASDAQ.

113. As of June 12, 2026, trading of Charming Medical stock remains halted. There is no indication it will ever trade again, and there is no venue upon which a U.S. investor can sell shares at any price. As a result, Charming Medical shares have become effectively worthless.

**<u>Additional Allegations Applicable Only to the Exchange Act Claims</u>**

114. Plaintiffs make the additional allegations contained in Paragraphs 115 to 128 below with respect to their fraud claims brought under Sections 10(b) and 20(a) of the Exchange Act only. Plaintiffs disclaim any reliance upon these allegations or incorporation of these allegations in their Securities Act claims (Counts I and II).

115. Charming Medical and the Individual Defendants are makers of the statements contained in the Registration Statement because Charming Medical is the Issuer of the statements, Wong and Cheung signed the Registration Statement, and Yeung, Gung, and Yu gave their consent to be named in the Registration Statement as directors of the Company upon completion of the IPO.

---

[17] SEC, *Order on Suspension of Trading* (Nov. 11, 2025), https://www.sec.gov/files/litigation/suspensions/2025/34-104176.pdf.

**The Gatekeeper Defendants Knew or Recklessly Disregarded the Risk That Charming Medical Would Be the Subject of Fraud**

116. Since at least 2024, Cathay Securities, WWC, and Cogency Global have enabled Microcap Pump-and-Dump Schemes on numerous occasions.

117. As discussed in Paragraphs 62 to 80, before Charming Medical went public, each of the Gatekeeper Defendants participated in the IPOs of multiple companies involved in Microcap Pump-and-Dump Schemes. Cathay Securities was involved in Microcap Pump-and-Dump Schemes at least 7 times, Cogency Global was involved in Microcap Pump-and-Dump Schemes at least 10 times, and WWC was involved in Microcap Pump-and-Dump Schemes at least 4 times.

118. Before Charming Medical's IPO, the SEC took the highly unusual step of suspending the trading of at least 2 other microcap companies for whom Cathay Securities served as an underwriter after they became exposed as targets of the Microcap Pump-and-Dump Schemes. *See* ¶69.

119. On or before Charming Medical's IPO, the Gatekeeper Defendants knew or recklessly disregarded that Charming Medical was then part of or highly likely to be part of a Microcap Pump-and-Dump Scheme. In part this was known because the Gatekeeper Defendants themselves repeatedly contracted with companies that were involved in such pump-and-dumps, and in part it was known because Charming Medical had all the characteristics of companies that were so manipulated, including tiny revenue and income, a dominant controlling shareholder and an extremely low public float that rendered the Company highly susceptible to a squeeze.

120. In fact, before the Company's IPO, Cathay Securities posted a notice on its website admitting that it had actual knowledge of Microcap Pump-and-Dump Schemes orchestrated on social media and chat groups, including its claim that stock manipulators were impersonating Cathay Securities to fraudulently promote microcap stocks. Still, Cathay Securities underwrote

Charming Medical's IPO while omitting any mention of the known risk or its role in prior frauds from the Registration Statement.

121. Given their repeated involvement in prior Microcap Pump-and-Dump Schemes, the Gatekeeper Defendants either knew that Charming Medical would be the subject of a serious fraud or they recklessly disregarded that fact. As such, the Gatekeeper Defendants either knew that the Registration Statement contained materially false and misleading statements and omissions or they turned a blind eye to the defects in the Registration Statement.

**Acceleration of the IPO to Avoid a Prohibitive NASDAQ Rule Demonstrates Scienter**

122. On September 4, 2025, NASDAQ filed the Proposed Rule requiring China-based issuers to raise at least $25 million to list, expressly because their small offering sizes and public floats made them susceptible to manipulation. Charming Medical only planned to raise up to $7.36 million, and the Proposed Rule, had it come into effect, would have barred the Company's listing outright. The fact that Wong and Cathay Securities asked the SEC to accelerate the effectiveness of the Registration Statement on September 29, 2025 after the Proposed Rule was published, while omitting to mention the existence or implications of the Proposed Rule in the Registration Statement, bolsters the inference that the Defendants intended to facilitate a Microcap Pump-and-Dump Scheme.

**Temporal Proximity between the IPO and the Trading Halt Bolsters Scienter**

123. The temporal proximity between Charming Medical's IPO on October 21, 2025 and the SEC's trading halt on November 11, 2025 further bolsters the inference of scienter. The Company went public on October 21, 2025, yet within 10 days, its shares were being aggressively promoted on social media, driving the price up from $4 to nearly $20. *See* ¶108. The manipulation peaked on November 11, 2025 — barely three weeks after the IPO — when more than 2.2 times the entire public float traded at prices far above the offering price, prompting the SEC to suspend

trading that same evening. *See* ¶¶109-11. The near-instantaneous onset of the very risk that the Defendants failed to disclose reinforces the inference that the risk of Microcap Pump-and-Dump Schemes was known or recklessly disregarded at the time of the offering, rather than a remote contingency that happened to come to pass.

**The Individual Defendants' Conduct Before and After the IPO Shows Scienter**

124. The Individual Defendants took the Company public at or around the same time that other China-based companies with similar profiles and structures became vulnerable to Microcap Pump-and-Dump Schemes. They also deliberately hired the Gatekeeper Defendants despite their extensive involvement in facilitating fraud before the IPO. Charming Medical was then the subject of a highly unusual trading halt on November 11, 2025, and never traded again on any exchange. This kind of halt is highly unusual and does not occur in the absence of a serious and severe underlying problem. NASDAQ further extended the halt indefinitely unless Charming Medical provided it with further information. The fact that Charming Medical has not provided sufficient information to NASDAQ in over 6 months, and its stock has not traded in the United States in any other way raises a strong inference that the Company had no other purpose in going public in the United States than to facilitate a Microcap Pump-and-Dump Scheme.

125. The Individual Defendants' suspicious resignations following the suspension of trading only bolster that inference. Rather than take any steps to address NASDAQ's concerns or help find another venue where the Company's common stock could trade, most of the directors of the Company decided to abandon the sinking ship.

126. On December 23, 2025, Gung resigned from the Board of Directors.

127. On March 27, 2026, Yeung resigned from the Board of Directors. On April 2, 2026, Matthew Mo Kan Tsui ("Tsui") was appointed to replace Yeung.

128. On April 27, 2026, a mere 25 days later, Tsui also resigned from the Board of Directors.

## LOSS CAUSATION

129. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

130. During the Class Period, Plaintiffs and the Class purchased Charming Medical's securities at artificially inflated prices and were damaged thereby. The trading of Charming Medical's securities has been halted indefinitely, and the misrepresented and omitted information was proximately related to the trading halt. There is no indication that U.S. investors will ever be able to sell shares at any price, effectively rendering the Class's securities worthless.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

131. Plaintiffs bring this Action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities that: (1) purchased or otherwise acquired Charming Medical's common stock pursuant or traceable to Charming Medical's Registration Statement issued in connection with its October 21, 2025 IPO, seeking to pursue remedies under Sections 11 and 15 of the Securities Act; and/or (2) purchased or otherwise acquired the Company's common stock between October 21, 2025 and November 11, 2025, both dates inclusive, on the NASDAQ or another U.S. trading venue, seeking to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act. Excluded are Defendants herein, former and current officers, senior managers, and directors of Charming Medical, any entity in which any of the Defendants (alone or in combination with other Defendants) has or had a controlling interest, and any affiliates, related entities, joint ventures, family members, legal representatives, heirs, successors or assigns of any of the above.

132. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. During the short Class Period, average weekly trading volume was 4.37 million shares, with 15.18 million shares currently outstanding. The high average trading volume and weekly turnover create a strong presumption in favor of market efficiency. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

133. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

134. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

135. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Registration Statement contained material misrepresentations or omissions;

- whether the Individual Defendants, Cathay Securities, WWC, or Cogency Global have a viable good faith defense to the strict liability otherwise imposed by Section 11 of the Securities Act;

- whether the Defendants can establish negative causation as a defense to or as a reduction of the strict liability otherwise imposed by Section 11 of the Securities Act;

- whether Individual Defendants were controlling persons of Charming Medical;

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- (for the Exchange Act claims only) whether the prices of Charming Medical's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein;

- (for the Exchange Act claims only) whether the Class has sustained damages and, if so, what is the proper measure of damages;

- (for Exchange Act claims only) whether the misrepresentations or omissions in the Registration Statement were made with scienter; and

- (for Exchange Act claims only) whether the losses of Plaintiffs and other investors were caused by the material misrepresentations and omissions in the Registration Statement;

136. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

137. With respect to the Exchange Act claims, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- the Company's securities traded in an efficient market;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

138. Based upon the foregoing, and because the alleged manipulative conduct affected equally the price of all listed shares, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

139. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as the Exchange Act claims herein are based primarily on Defendants' omission of material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**
**(Violations of Section 11 of the Securities Act Against All Defendants)**

140. Plaintiffs repeat and reallege allegations of Paragraphs 1 through 113 and 129 through 139 as if fully set forth herein except for the allegations related only to the Exchange Act claims identified in Paragraphs 114 through 128.

141. This Count is based on strict liability and does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

142. This claim is asserted by Plaintiffs against Defendants Charming Medical, Wong, Cheung, Yeung, Gung, Yu, Cathay Securities, WWC, and Cogency Global on behalf of all persons who purchased shares of the Company's common stock pursuant to and/or traceable to the Company's IPO, in which the shares registered under the Registration Statement were sold.

143. The Individual Defendants identified under this Count are strictly liable under the Securities Act as signatories of the Registration Statement for the misrepresentations and omissions contained therein regarding Charming Medical's risk disclosure statements, as identified in Paragraphs 89 to 107 above.

144. Charming Medical is strictly liable as the Issuer under the Securities Act for the misrepresentations and omissions it made in the Registration Statement, as identified in Paragraphs 89 to 107.

145. None of the Defendants named herein conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the Registration Statement, identified in Paragraphs 89 to 107 above, were true, were without omissions of material fact or were otherwise not misleading, or that the Registration Statement accurately identified the known risks, uncertainties, and adverse trends as required by Regulation S-K.

146. By reason of the conduct alleged herein, each of the Defendants named herein has violated Section 11 of the Securities Act.

147. Almost all non-offered shares were subject to a lock-up agreement, and there is no evidence that any non-registered shares were (or even could have been) sold prior to the trading halt.

148. Plaintiffs and the Class have sustained damages because the value of their Charming Medical common stock is worthless since trading ceased and is virtually certain not to resume. Their damages are attributable by law to Defendants in the absence of proof that the decline in value was caused by other factors, for which proof has not been established.

149. At the time of their purchases, Plaintiffs and the Class were without knowledge of the wrongful conduct alleged herein, and could not have reasonably discovered those facts more

than one year prior to the filing of the initial complaint in this Action. The initial complaint was filed less than a year after the time that Charming Medical offered the shares covered by the Registration Statement to the investing public.

150. By virtue of the foregoing, Plaintiffs and the other Class members are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

**COUNT II**
**(Violations of Section 15 of the Securities Act Against Wong and Cheung)**

151. Plaintiffs repeat and reallege allegations of Paragraphs 1 through 113 and 129 through 139 as if fully set forth herein. The allegations contained in Paragraphs 114 through 128 are expressly excluded from this claim, which does not allege fraud, recklessness or intentional misconduct.

152. Wong, by virtue of her office, directorship, and controlling interest in Charming Medical, is a controlling person of Charming Medical within the meaning of Section 15 of the Securities Act. Wong managed the day-to-day affairs of the Company and was in possession of material information that rendered the Registration Statement misleading.

153. Cheung, by virtue of her office in Charming Medical, is a controlling person of Charming Medical within the meaning of Section 15 of the Securities Act. Cheung also managed the day-to-day affairs of the Company and was in possession of material information that rendered the Registration Statement misleading.

154. By virtue of the conduct alleged herein, Wong and Cheung are liable as control persons for the primary violations of Section 11 by Charming Medical, as alleged in Count I. Each could have prevented Charming Medical from employing the defective Registration Statement either by withholding signature or using her influence over the Company.

155. Wong and Cheung did not conduct a reasonable investigation or possess a reasonable basis for the belief that the statements contained in the Registration Statement and identified in Paragraphs 89 to 107 above were true, were without omissions of material fact, and were not misleading.

156. Each of these Defendants is liable to the Plaintiffs and the Class for damages suffered as a result of the primary Securities Act violations committed by Charming Medical.

**COUNT III**
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against Defendants Wong, the Gatekeeper Defendants, and Charming Medical)**

157. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except for the allegations contained in Paragraphs 100-107 to the extent they plead free standing omissions claims brought under Section 11 of the Securities Act regardless of whether a material misstatement was made in the Registration Statement.

158. During the Class Period, Wong, Charming Medical and the Gatekeeper Defendants employed devices and artifices to defraud, and carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (a) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (b) cause Plaintiffs and the other members of the Class to purchase Charming Medical's securities at an artificially inflated price. In furtherance of this unlawful scheme, plan and course of conduct, the Defendants made the misleading statements alleged in Paragraphs 89 to 107, and engaged in additional unlawful acts as alleged herein.

159. Specifically, the Defendants employed devices, schemes, and artifices to defraud Charming Medical's investors by conspiring together to take Charming Medical public under circumstances that would facilitate a Microcap Pump-and-Dump Scheme. Each of the Defendants

engaged in numerous acts and practices in furtherance of the scheme, including: (a) agreeing to take Charming Medical public despite knowing that its profile and structure — a small, obscure business, minimal revenues, a dominant controlling shareholder, and a low public float of less than 12.12% — matched the precise profile of issuers that had repeatedly been involved in Microcap Pump-and-Dump Schemes; (b) meeting and coordinating with one another in connection with the preparation of the defective Registration Statement, and taking the various steps necessary to prepare and issue it while omitting the known risks of the Microcap Pump-and-Dump Scheme; (c) in the case of the Gatekeeper Defendants, lending their names and services as gatekeepers to facilitate the Charming Medical IPO; and (d) in the case of Cathay Securities, the Company, and Wong, asking the SEC to accelerate the effectiveness of the Registration Statement so that the IPO could be completed just before the Proposed Rule — which would have barred the listing outright — took effect.

160. As a result of this fraudulent scheme and failure to disclose material facts, the value of Charming Medical's securities was artificially inflated during the Class Period and/or harmed by the Microcap Pump-and-Dump Scheme.

161. In ignorance of the fact that the value of Charming Medical's securities was artificially inflated and/or harmed by the scheme, Plaintiffs and the other members of the Class acquired securities during the Class Period at artificially high prices, and were damaged thereby.

162. At the time Wong, Charming Medical and the Gatekeeper Defendants orchestrated this fraudulent scheme, Plaintiffs and the other members of the Class were ignorant of its nature or existence. Had Plaintiffs and the other members of the Class known the truth about this unlawful scheme, they would not have purchased or otherwise acquired the securities of Charming Medical,

or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices at which they did.

163. As a direct and proximate result of the fraudulent scheme and misconduct alleged herein, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of Charming Medical's securities during the Class Period.

164. By virtue of the foregoing, Wong, Charming Medical and the Gatekeeper Defendants thus violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiffs and the Class members who have been damaged as a result of such violations.

## COUNT IV
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against Charming Medical and the Individual Defendants)**

165. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except for the allegations contained in Paragraphs 100-107 to the extent they plead free standing omissions claims brought under Section 11 of the Securities Act regardless of whether a material misstatement was made in the Registration Statement.

166. This Count is asserted against Defendants Charming Medical, Wong, Cheung, Yeung, Gung, and Yu for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

167. At the time of the Registration Statement and during the Class Period, these Defendants made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and made the misstatements and omissions at least recklessly. Their misstatements were intended to, and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Charming Medical securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Charming Medical common stock at artificially inflated prices.

168. Each of the Individual Defendants' primary liability and controlling-person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

169. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The material misrepresentations and/or omissions were made either knowingly or recklessly and for the purpose and effect of concealing or downplaying Charming Medical's significant vulnerability to an online pump-and-dump scheme. If Defendants did not have actual knowledge of the misrepresentations and/or omissions alleged, they were severely reckless in failing to obtain such knowledge by

deliberately refraining from taking those steps necessary to discover whether the statements were materially misleading when made.

170. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Charming Medical's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Charming Medical's securities during the Class Period at artificially high prices and were damaged thereby.

171. In ignorance of the adverse facts concerning Charming Medical's high risk to manipulation that was known or recklessly disregarded by the Defendants named in this Count, and which was concealed by the misrepresentations and omissions alleged herein, Plaintiffs and the other members of the Class purchased or otherwise acquired Charming Medical securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

172. During the Class Period, Charming Medical securities were traded on an active and efficient market. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Charming Medical securities was substantially lower

than the prices paid by Plaintiffs and the other members of the Class. The value of Charming Medical securities has been destroyed because of the indefinite trading halt, to the injury of Plaintiffs and Class members.

173. By reason of the conduct alleged herein, Charming Medical, Wong, Cheung, Yeung, Gung, and Yu knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

174. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period. Charming Medical, Wong, Cheung, Yeung, Gung, and Yu are thus liable for damages in connection with these losses under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT V**
**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

175. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except for the allegations contained in Paragraphs 100-107 to the extent they plead free standing omissions claims brought under Section 11 of the Securities Act regardless of whether a material misstatement was made in the Registration Statement.

176. During the Class Period, Wong, Cheung, Yeung, Gung, and Yu participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's false and misleading statements.

177. As officers and/or directors of a publicly owned company, Wong, Cheung, Yeung, Gung, and Yu had a duty to disseminate accurate and truthful information with respect to the

Company's risk disclosures, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

178. Because of their positions of control and authority as senior officers, Wong, Cheung, Yeung, Gung, and Yu were able to, and did, control the contents of their direct communications with investors, which the Company disseminated in the marketplace during the Class Period concerning the Company's risk disclosures. Throughout the Class Period, Wong, Cheung, Yeung, Gung, and Yu exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. Wong, Cheung, Yeung, Gung, and Yu therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of the Company's securities.

179. Wong, Cheung, Yeung, Gung, and Yu, therefore, acted as controlling persons of the Company. By reason of their senior management positions and/or being directors of the Company, each of these Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of these Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

180. By reason of the above conduct, Wong, Cheung, Yeung, Gung, and Yu are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant Action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: June 12, 2026

**POMERANTZ LLP**

*/s/ Jianan Jiang*
Omar Jafri (*pro hac vice*)
Jianan Jiang (*pro hac vice*)
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312)-377-1184
ojafri@pomlaw.com
ajiang@pomlaw.com

J. Alexander Hood II
Jeremy A. Lieberman
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
ahood@pomlaw.com
jalieberman@pomlaw.com
***Attorneys for Lead Plaintiffs Grant Albert, James McKnight, and Bernard Whelan***

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of June, 2026, I electronically filed the foregoing Amended Complaint with the Clerk of the Court using the CM/ECF system. I certify that service will be accomplished by the CM/ECF system for all participants in this case who are registered CM/ECF users.

*/s/ Jianan Jiang*

Jianan Jiang
POMERANTZ LLP
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Tel.: (312) 377-1181
Fax: (312) 377-1184
ajiang@pomlaw.com